**Paul Byrne HARING, Plaintiff,**

v.

**W. Michael BLUMENTHAL, Defendant.**

**Civ. A. No. 78–0085.**

United States District Court,
District of Columbia.

April 10, 1979.

Paul Byrne Haring, pro se.

Stephen S. Cowen, Asst. U. S. Atty., Washington, D. C., for defendant.

## OPINION

HAROLD H. GREENE, District Judge.

In this action plaintiff requests relief from alleged religious discrimination in violation of Title VII of the Civil Rights Act of 1964, and an injunction [1] to restrain defendant from classifying "abortion clinics and other organizations promoting abortion and homosexuality as tax exempt organizations."

Plaintiff is an employee of the Internal Revenue Service, occupying the position of Tax Law Specialist, GS–12, in the Technical

1. Plaintiff also seeks relief under the Declaratory Judgment Act, 28 U.S.C. § 2201.

Branch of the Exempt Organizations Division.[2] He applied for promotion to Tax Law Specialist (Reviewer), GS–13, in that division, but was turned down, allegedly on account of his Catholic religious belief and conduct.[3] The government contends that there also were other reasons for plaintiff's failure to achieve promotion, but for purposes of the present motion it concedes that plaintiff was not promoted solely because of his inability or unwillingness to abide by Internal Revenue Service policies on abortion.[4] After receiving the agency's final decision on December 19, 1977, plaintiff filed the instant action which, as indicated, challenges the tax-exempt status of various organizations and alleges violations of his rights under Title VII.[5] Defendant has moved for a dismissal of the tax exempt status claim, and for summary judgment on the employment discrimination claim.

## I

Under section 501(a) of the Internal Revenue Code, 26 U.S.C. § 501(a), organizations more specifically designated in sections 501(c)(3) and (c)(4) as being organized for religious, charitable,[6] educational, or social welfare purposes, are exempt from income taxation. Within the framework of these statutory provisions, the Internal Revenue Service has granted tax-exempt status to abortion clinics and to various organizations involved with homosexual rights, and additional Revenue Rulings dealing with abortion clinics may be issued at future dates. One portion of plaintiff's suit challenges these present and expected rulings, and defendant has moved to dismiss that part of the complaint on several grounds, principally plaintiff's alleged lack of standing to bring the action.

■■■ The requirement in the law that only a person with "standing" may pursue a lawsuit in the courts stems from the requirement in Article III of the Constitution that the federal courts may hear and decide only actual "cases" and "controversies." *Flast v. Cohen*, 392 U.S. 83, 95, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). While the issue of standing has been much mooted and has witnessed several shifts in perspective, it is now clear that the "gist of the question of standing" is whether the party seeking relief has "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions?" See *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). If a plaintiff is unable to make such an allegation, he lacks standing; the case then is deemed not to involve an actual controversy but to call merely for an advisory opinion;[7] and the

2. The Exempt Organizations Division is responsible for reviewing applications submitted by organizations seeking tax exempt status, and for approving the applications if they are in compliance with section 501 of the Internal Revenue Code, 26 U.S.C. § 501.

3. Plaintiff does not claim discrimination because he is a Catholic, but because he "sought to lead the life of a Roman Catholic." In fact, it appears that three of the four persons granted the reviewer position in the recent promotion action are Roman Catholics.

4. The principal focus here is on the Internal Revenue Service's policies concerning organizations which advocate or conduct abortions, but plaintiff has stated that his position would be the same with respect to any organization "which violates or promotes and encourages violations of the Ten Commandments of God and violations of God's Natural Law," including, in addition to the promotion of abortion,

those promoting homosexuality, worship of the devil, euthanasia, atheism, legalization of marijuana, immoral sexual experiments, sterilization or vasectomies, artificial contraception, and witchcraft. For the sake of simplicity, these matters will generally be referred to hereinafter under the abortion label.

5. Plaintiff seeks a retroactive promotion and back pay.

6. The promotion of health and hospital care is considered to be a charitable purpose within the meaning of the Internal Revenue Code. Revenue Ruling 69–545, 1969–2 C.B. 117.

7. See *United States v. Fruehauf*, 365 U.S. 146, 81 S.Ct. 547, 5 L.Ed.2d 476 (1961). Mr. Justice Frankfurter has suggested that the requirement of standing to sue was recognized as long ago as the period prior to the adoption of the Constitution, and that it was applied both in the

court lacks jurisdiction. *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 37 note 15, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). The government asserts that this is precisely the situation here.

Plaintiff in this case concedes, as he must, that he does not have standing to challenge the exemption rulings at issue here merely because he is a citizen or taxpayer (*Schlesinger v. Reservists to Stop the War*, 418 U.S. 208, 228, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974); *United States v. Richardson*, 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974); *Tax Analysts and Advocates v. Simon*, 390 F.Supp. 927 (D.D.C.1975), affirmed, 184 U.S.App.D.C. 238, 566 F.2d 130 (1977) )[8] and claims instead to find a basis for his ability to bring this lawsuit in his employment status.

■ In order to achieve standing in his capacity as an employee of the Internal Revenue Service, plaintiff must be able to allege that the challenged actions of that Service are causing him an "injury in fact" and that his interests are arguably within "the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Association of Data Processing Service Organization, Inc. v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); *Barlow v. Collins*, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970). In the view of this Court, he cannot satisfy either test.

■ Plaintiff claims that he is suffering an injury in fact in that, but for the existence of IRS tax policies which exempt abortion clinics from taxation, he would not be subjected to the alleged discrimination with respect to promotions which stems from his objection to these exemptions. However, there clearly is an insufficient nexus between the exemption rulings plaintiff complains about and the alleged harm to his beliefs and practices to satisfy the injury in fact standard.[9] It is the action of the promotion panel, not the exemption rulings of IRS, which is the direct cause of the injury to plaintiff; he is able to challenge that action in a Title VII suit; he has in fact done so; and under the law his action pursuant to that statute constitutes his exclusive remedy for discrimination in employment. *Brown v. General Services Administration*, 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976).[10]

Plaintiff's allegation of injury in fact is thus on its face insufficient, for there would still be no cognizable injury even if the allegation were proved. Indeed, if the requisite nexus were found to exist here, every employee of every governmental organization would automatically be deemed to have standing to challenge any action of government, or at least any action of the department or agency which employs him, for he could acquire such standing by the simple device of refusing to implement the particular governmental policy and await the inevitable adverse personnel action. Were the Court to entertain such a doctrine, the consequence would be that only government employees, but not other citizens or taxpayers, would be able to challenge in court

colonial courts and those of Westminster. *Joint Anti-Fascist Committee v. McGrath*, 341 U.S. 123, 150, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring).

8. The Court noted in *Flast v. Cohen, supra,* that a taxpayer as such is a proper party plaintiff only if he challenges the unconstitutionality of an exercise of congressional power under the taxing and spending clause of Art. I, sec. 8 of the Constitution, and even then he must also establish a nexus between his status and the precise nature of the constitutional infringement alleged. 392 U.S. at 102, 88 S.Ct. 1942.

9. See *Simon v. Eastern Kentucky Welfare Rights Organization, supra; Linda R.S. v. Richard D.,* 410 U.S. 614, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973); *American Society of Travel Agents, Inc. v. Blumenthal,* 184 U.S.App.D.C. 253, 566 F.2d 145 (1977).

10. Moreover, to require the IRS to accommodate its policies to the religious views of one employee would be an obvious, intolerable, and therefore undue hardship to the legitimate interests of the government. *Trans World Airlines v. Hardison,* 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977). See discussion in Part IV *infra.*

governmental action with which they disagree—hardly an appropriate basis either in law or in public policy upon which to rest or extend the jurisdiction of the federal courts.

■ Plaintiff has also failed to show that his interest in reversing the exemption policies is arguably within the zone of interests protected by the First Amendment.

The abortion clinics themselves obviously are not vested with the requisite governmental authority for a valid constitutional deprivation claim, nor do they in any way impede or interfere with plaintiff's freedom of speech or religion. Insofar as the grant of tax exemptions for such clinics are concerned, while they of course constitute governmental action, it is action which does not violate the Constitution.

■ Tax exemptions for religious organizations in general have long been held not to constitute an impermissible government sponsorship of religion. *Walz v. Tax Commission*, 397 U.S. 664, 675, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970); *Marker v. Shultz*, 158 U.S.App.D.C. 224, 485 F.2d 1003 (1973). More specifically, the grant of an exemption from taxation which is otherwise appropriate, *e. g.* to providers of health care, does not impermissibly infringe upon the Establishment Clause of the First Amendment merely because abortions are or are not performed by the particular health care organization. See *Ward v. St. Anthony's Hospital*, 476 F.2d 671 (10th Cir. 1973); *Chrisman v. Sisters of St. Joseph of Peace*, 506 F.2d 308, 314 (9th Cir. 1974) (Catholic hospitals which refuse to allow abortions to be performed on their premises

are not ineligible for tax exemption). Such exemptions do not foster an excessive governmental entanglement with religion, inhibit the free exercise of religion, or fail to reflect a secular purpose. See *Tilton v. Richardson*, 403 U.S. 672, 678, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971); *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). Different religions take different views on abortion (*Roe v. Wade*, 410 U.S. 113, 160–61, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973)) and the Constitution neither requires nor prohibits governmental funding of abortions. *Maher v. Roe*, 432 U.S. 464, 480, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977). For these reasons, plaintiff's claimed interest cannot be regarded as being within the zone of interests protected by the First Amendment.

■ To the contrary, it is plaintiff's claim which, if granted, would be violative of the First Amendment. Should the Internal Revenue Service or the Court grant him the relief he seeks, they would do precisely that which the Supreme Court in *Tilton*, *supra*, stated government may not do—they would entangle government with the tenets of plaintiff's particular religious faith and inhibit the free exercise of religion by those with views opposed to plaintiff's.[11] See also, *Epperson v. Arkansas*, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968).[12]

■ Finally, even if plaintiff had standing to sue, his claim would be subject to dismissal because the Anti-Injunction Act, 26 U.S.C. § 7421(a), bars any injunctive action brought for the purpose of restraining the assessment or collection of any tax

11. Needless to say, plaintiff's rights and his views are entitled to no more weight under the Constitution and laws of the United States than competing speech or belief.

12. The same reasons that inhibit plaintiff's standing to bring the action also compel the conclusion that he has failed to establish any entitlement to substantive relief with respect to the tax exemption claim. Rule 12(b)(6), F.R. Civ.P. As noted, *supra*, not only is there no nexus between his failure to achieve promotion and the tax exemption rulings issued by the IRS, but the relief plaintiff seeks would require the government to conform its tax exemption

policies to the tenets of the Catholic Church, as plaintiff interprets those tenets, and it would thus run afoul of the First Amendment's prohibition on the establishment of religion. While, as *McGlotten v. Connally, infra*, indicates, it is unconstitutional for the government to provide any benefit, however, indirect, to organizations engaged in racial discrimination, the test is a different one in matters of religion, "where benevolent neutrality on the part of the federal government is the standard . . . ." *Marker v. Connally*, 337 F.Supp. 1301, 1304 (D.D.C. 1972), *aff'd, Marker v. Shultz, supra*.

"by any person." Whatever may have been the gloss placed upon that statute by *McGlotten v. Connally*, 338 F.Supp. 448 (D.D.C.1972) (three-judge court), it is now clear that the law means what its words plainly imply—that it prevents the institution of injunction actions to challenge tax exemption rulings in favor of other taxpayers. *Bob Jones University v. Simon*, 416 U.S. 725, 731 note 6, 94 S.Ct. 2038, 40 L.Ed.2d 496 (1974); *Commissioner v. "Americans United," Inc.*, 416 U.S. 752, 760–2, 94 S.Ct. 2053, 40 L.Ed.2d 518 (1974); *Enochs v. Williams Packing and Navigation Co.*, 370 U.S. 1, 82 S.Ct. 1125, 8 L.Ed.2d 292 (1961); Bittker and Kaufman, *Taxes and Civil Rights: "Constitutionalizing" the Internal Revenue Code*, 82 Yale L.J. 51, 58 (1972).[13]

For these reasons, defendant's motion to dismiss the claim which challenges the validity of tax exemptions to abortion clinics and other organizations will be granted.

## II

Plaintiff's second claim is that he was denied a promotion to the position of a reviewer position in IRS's Exempt Organizations Branch in violation of the Constitution of the United States and of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–2(a)(1). In support of this claim, plaintiff argues, first, that the grant of tax exemptions to groups favoring abortions[14] is illegal and that for this reason he should not be denied promotion for failing to implement the policy which establishes such grants, and second, that to deny him a promotion solely because of his unwillingness to process tax exemption appli-

cations for purposes which he regards as repugnant to his religious principles violates his rights under Title VII. The first of these contentions has little merit; the second presents a far more substantial question.

## III

In order to prevail on his "illegality" argument, plaintiff must demonstrate, first, that the legality of the decisions of the Internal Revenue Service to grant tax exemption to abortion clinics and to organizations advocating free choice with respect to abortions may be determined by an employee of IRS, that is, by his refusal to implement them; and second, if the answer to the first question is in the affirmative, that the IRS decisions in fact violate the Constitution or laws of the United States. He has failed in both respects.

As has been noted, plaintiff lacks standing to contest the validity of IRS rulings. Unless and until the Congress, or a court of competent jurisdiction in an action by an individual with the requisite standing to sue, determines that a particular tax exemption ruling is invalid, the employees of the Service, as long as they wish to remain in that status, are obliged to implement that ruling. Not merely the concept of a uniform tax policy but the effectiveness of the government of the United States as a functioning entity would be in jeopardy if each employee could take it upon himself to decide which particular laws, regulations, and policies are legal or illegal, and to base his official actions upon that private determination.[15]

---

**13.** Since the injunctive relief plaintiff seeks is barred by the Anti-Injunction Act, declaratory relief is likewise unavailable. See 28 U.S.C. § 2201; *Bob Jones University v. Simon, supra*, 416 U.S. at 732 note 7, 94 S.Ct. 2038; *Junior Chamber of Commerce of Rochester v. United States Jaycees*, 495 F.2d 883, 889 (10th Cir. 1975).

**14.** On this issue, plaintiff does not appear to challenge exemptions other than in the abortion area. Compare note 4 *supra*.

**15.** Plaintiff's comparison of his situation with that of the Nuremberg defendants is grossly

simplistic. The Nuremberg defendants could have escaped liability by failing to seek and retain positions which exposed them to the execution of objectionable activity; and, should plaintiff feel sufficiently strongly about the matter, he may do likewise. Beyond that, plaintiff's analogy demonstrates primarily that debates and dialogues on public issues have become so debased in recent years that such terms as genocide, war crime, crimes against humanity, and the like are bandied about with considerable abandon in connection with almost every conceivable controversial issue of public policy. There is not the slightest simi-

The President must "take Care that the Laws be faithfully executed" (U.S. Const., Art. II, sec. 3), and he is not permitted to refrain from executing laws duly enacted by Congress. See *National Treasury Employees Union v. Nixon,* 160 U.S. App.D.C. 321, 492 F.2d 587 (1974); *United States v. Alessio,* 528 F.2d 1079 (9th Cir. 1976); *Guadamnz v. Ash,* 368 F.Supp. 1233 (D.D.C.1973). See also *Goldwasser v. Brown,* 135 U.S.App.D.C. 222, 230, 417 F.2d 1169, 1177 (1969), *cert. denied,* 397 U.S. 922, 90 S.Ct. 918, 25 L.Ed.2d 103 (1970). Surely an individual employee in the Executive Branch has no greater power in that regard.

Even if plaintiff could, somehow, raise the illegality point, it would not help his case. He has cited various fragments of congressional enactments, old as well as relatively more recent,[16] in support of his contention that abortion is illegal and so is the exemption from taxation of groups advocating abortion. However, it is clear that these various fragments of legislation are unsupportive of plaintiff's broad thesis. Not one has any bearing on the issue of the legality of tax exemptions for abortion clinics, and all of them, moreover, predate the 1973 Supreme Court decisions which dealt exhaustively with the abortion question in its historical, constitutional, and statutory context.

In *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) and *Doe v. Bolton,* 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973), the Supreme Court considered in great detail and at length the history and the legality of abortion laws in the United States, at common law in England, and elsewhere, and concluded both that the right to privacy includes the right to an abortion and that state laws which punish the performance of abortions may be unconstitutional as violative of the Due Process Clause of the Fourteenth Amendment. Not only is there no suggestion in these opinions that the Court deemed that Congress had spoken to prohibit abortions,[17] but they affirmatively hold that, depending on the circumstances, there is a constitutional right to abortion. Thus, there is no basis for plaintiff's claim that the Internal Revenue Service violates federal law when it grants tax exemptions to abortion clinics.

The authority of the Commissioner of Internal Revenue to issue revenue and tax exemption rulings is based on 26 U.S.C. § 7805. He has exercised that authority in accordance with law. 26 C.F.R. 1–501(c)(3)–1(d)(2)(2). No court has struck down his rulings, and the Congress—which has ultimate authority over tax policy—has not overruled the Commissioner by appropriate legislation. In short, plaintiff has totally failed to support his illegality argument.

## IV

Section 703(a)(1) of the Civil Rights Act, 42 U.S.C. § 2000e–2(a)(1), 42 U.S.C. § 2000e(j) (1970 ed., Supp. V), provides that it "shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." In its 1972 amendments to the Act, Congress added the following definition

---

larity between the crimes committed under the aegis of a violent dictatorship and the implementation of laws adopted under a system of government which offers free elections, freedom of expression, and an independent judiciary as safeguards against excesses and as a guarantee of the ultimate rule of a sovereign citizenry.

**16.** *E. g.,* 18 U.S.C. §§ 1461, 1462; and criminal statutes making it a crime to commit abortions in the District of Columbia and in the Canal Zone. Plaintiff also refers to the difficulty the

Congress has had in agreeing on a formula for funding abortions for indigents, but it is not clear what relevance that debate has to the issues in this case.

**17.** The precise issue of tax exemptions was not before the Court; but in view of its exhaustive treatment of the subject of abortions, its failure to mention the federal legislative enactments relied on by plaintiff speaks loudly to the proposition that no inference of illegality should be drawn.

The term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.[18]

It is that provision which is principally at issue here.

On this motion for partial summary judgment,[19] plaintiff claims that the Internal Revenue Service is able without undue hardship to accommodate its operations to his practices, while the government argues that, for a variety of reasons it cannot do so.

First. The Internal Revenue Service contends that plaintiff's refusal to handle applications for exemptions from persons or groups which advocate abortion or other practices to which he objects creates problems with the efficient and expeditious operations of the office in which he works.

As indicated, plaintiff seeks promotion to the position of reviewer in the Exempt Organizations Division. Such reviewers have considerable independent or quasi-judicial authority, for when a reviewer agrees with a tax law specialist recommendation to grant tax exempt status to an organization, he is authorized to issue a final favorable ruling.[20] Additionally, reviewers have administrative authority for they supervise a number of other persons. Currently, two reviewers are assigned to each group of 8–12 tax law specialists, and sometimes a reviewer must also substitute as an acting supervisor, leaving only one active reviewer available for the group. The Service contends that because of these staffing patterns plaintiff's refusal to process applications he considers objectionable would make it difficult to operate the Exempt Organizations Division were he to be promoted to one of the reviewer positions.[21]

Plaintiff's affidavit—which for present purposes must be assumed to be true—asserts that in his experience the types of cases with which he might have a moral or religious problem constitute only a minute percentage of the total volume of applications for exemption processed by a reviewer in the Exempt Organizations Division. He estimates that percentage to constitute "a fraction of 1% of the total cases or at most less than 2%."[22] Assuming this volume of cases to be accurate, it appears that the Internal Revenue Service should have no difficulty, on a purely mechanical level, to accommodate itself to the overt manifestations of plaintiff's beliefs. The applications for exemption which plaintiff refuses to handle could clearly be processed without undue hardship or burden to the Service, or any significant expense or loss of time, by another reviewer.[23] On this basis, therefore, defendant cannot meet the "undue hardship" test of section 703(a)(1).

Second. Defendant's next set of arguments may be grouped together for purpose

---

18. Prior to the enactment of this provision, the Equal Employment Opportunity Commission had issued guidelines substantially to the same effect. 29 C.F.R. 1605.1 (1968).

19. As noted *supra*, the government has asserted that there are reasons other than plaintiff's unwillingness to process certain exemption applications for its failure to promote him. However, these reasons are not before the Court on the instant motion.

20. When there is disagreement between them, the dispute is reviewed between them and may ultimately be resolved elsewhere.

21. IRS has accommodated plaintiff in his capacity as a tax law specialist by not assigning such applications to him.

22. See plaintiff's affidavit, p. 1. This general estimate was not contradicted in the deposition of Milton Cerny, Assistant Chief of the Branch.

23. If one of the two reviewers assigned to a particular group of tax law specialists should be absent for a few days for one reason or another, and plaintiff, as a reviewer, were to be excused from processing objectionable applications, IRS operations would still not be significantly impaired, for even in the normal course of events there is a delay of several weeks or months between the submission of applications for tax exemption and the IRS decision thereon.

of analysis, for all of them relate in one way or another to the Internal Revenue Service's fears that a precedent here would eventually come to complicate its operations to an unreasonable degree.

Thus, it is claimed that, if this plaintiff were permitted to become a reviewer notwithstanding his refusal to handle certain types of cases, others will be encouraged to do likewise, and a point will soon be reached where the agency will be faced with very real and substantial practical problems. Alternatively, it is contended that plaintiff's own views appear to be subject to change and amplification; that he began by refusing to deal with abortion and homosexuality, an area which he has now expanded to encompass "any organization which violates or promotes and encourages violations of the Ten Commandments of God and violations of God's Natural Law" (see note 4 *supra* ; and that it is impossible to predict how plaintiff's views will further change in the future and what proportion of a reviewer's workload might have to be diverted to accommodate those views. Finally, defendant suggests that, if plaintiff must be promoted to a reviewer position notwithstanding his announced policies, a precedent will be set for his promotion, or that of others like him, to higher and yet higher supervisory levels, where both from the point of view of administrative efficiency and of policy it will become less and less possible to avoid undue hardship to the Service. In short, defendant suggests, a line must be drawn at some time, and it might as well be here and now.

■ That line of reasoning, in all of its various aspects, misconceives the appropriate standard under the Civil Rights Act. The intent and effect of the 1972 amendments to the Act, as the Supreme Court pointed out in *Trans World Airlines, Inc. v. Hardison,* 432 U.S. 63, 74, 97 S.Ct. 2264, 2271, 53 L.Ed.2d 113 (1977) was to "make it an unlawful employment practice under § 703(a)(1) for an employer not to make reasonable accommodations, short of undue hardship, for the religious practices of his employees and prospective employees." While that principle is clear, unfortunately the applicable case law provides no significant guidance on the question of whether the "undue hardship" standard may be met by an employer's assumption that, should he accommodate one employee in one situation, it may well be that undue difficulties will arise if others were to assert the same or similar rights.

The *TWA* case itself is not illuminating on that issue, for it turned on the circumstance that an accommodation of an employee who refused to work on Saturdays would have amounted to a breach of the company's collective-bargaining agreement with a labor union (432 U.S. at 79, 97 S.Ct. 2264; see also, *Huston v. Local No. 93,* 559 F.2d 477 (8th Cir. 1977); *Ward v. Allegheny Ludlum Steel Corp.,* 560 F.2d 579 (3rd Cir. 1977)) and on the fact that to accommodate the employee would have entailed a specific financial burden on the employer. Neither of these factors is present here.

■ Other decisions by lower courts have sometimes held for [24] and sometimes against the complaining employee,[25] depending upon particular facts and circumstances, but generally they have failed to explore what appears to be the critical issue: whether the level of hardship must be measured by the accommodation of the one employee seeking relief or by the precedent-setting effect of the grant of such relief to him and the conceivable actions of others.

---

24. *Draper v. United States Pipe & Foundry Co.,* 527 F.2d 515 (6th Cir. 1976); *Reid v. Memphis Publishing Co.,* 468 F.2d 346 (6th Cir. 1972); *Riley v. Bendix Corp.,* 464 F.2d 1113 (5th Cir. 1972); *McDaniel v. Essex International, Inc.,* 571 F.2d 338 (6th Cir. 1978); *Redmond v. GAF Corp.,* 574 F.2d 897 (7th Cir. 1978).

25. *Dewey v. Reynolds Metals Co.,* 429 F.2d 324 (6th Cir. 1970), *aff'd. by an equally divided Court,* 402 U.S. 689, 91 S.Ct. 2186, 29 L.Ed.2d 267 (1971); *United States v. City of Albuquerque,* 545 F.2d 110 (10th Cir. 1976); *Williams v. Southern Union Gas Co.,* 529 F.2d 483 (10th Cir. 1976); *Jordan v. North Carolina Nat. Bank,* 565 F.2d 72 (4th Cir. 1977); *Chrysler Corp. v. Mann,* 561 F.2d 1282 (8th Cir. 1977).

In the absence of authoritative guidance, it seems to this Court that "undue hardship" must mean *present* undue hardship, as distinguished from anticipated or multiplied hardship. Were the law otherwise, any accommodation, however slight, would rise to the level of an undue hardship because, if sufficiently magnified through predictions of the future behavior of the employee's co-workers, even the most minute accommodation could be calculated to reach that level.[26]

 Under the Act, employers must make "reasonable accommodation" to the religious beliefs of their employees—a relative term which depends upon the facts and circumstances. *Redmond v. GAF Corp.*, 574 F.2d 897 (7th Cir. 1978). Unless the statutory mandate is to be rendered meaningless, it must be held to provide that until facts or circumstances arise from which it may be concluded that there can no longer be an accommodation without undue hardship, the employee's religious practices are required to be tolerated. This Court is not prepared to adopt a construction which would emasculate this law designed to protect religious liberty and the free exercise of religious practices and, to the extent that any of the decisions cited in note 25 *supra* may be construed as calling for such an interpretation, I decline to follow them.

There is, moreover, no reason to believe either that this plaintiff's zone of objectionable policies will grow significantly or that his stand will have a mushroom effect on other IRS reviewers. Irrespective of how plaintiff's objections to IRS policies are phrased, it appears, on this record at least, that they will still constitute only a small segment of his workload. Most IRS exemption decisions, it may safely be assumed, are in the more pedestrian realms of the financial world, and even when they involve other public policy issues, they are not likely very often to touch upon plaintiff's category of objectionable policies, however much those policies may have been inflated most recently to give them their broadest and most diffuse expression. Further—unlike, for example, the typical Saturday workday problem which has been before the courts in so many different guises—there is little real incentive for others to emulate this plaintiff. It is not probable that many employees will carry convictions of a sufficiently stubborn nature as would cause them to take the fairly extreme route this plaintiff has chosen. Unlike prohibitions on laboring during certain days of the week, the refusal to make decisions with respect to specific issues does not appear to be a widespread and deeply ingrained religious tenet.[27]

In any event, however, if, contrary to the assumptions made by the Court, it subsequently develops either that plaintiff enlarges the zone of his objections to such an extent that it encompasses a significant part of his assigned workload, or that other IRS employees follow his example and refuse to handle a significant number of applications for tax exemptions on grounds of offensiveness to religious belief, then at some point the level of "undue hardship" provided for in the statute will have been reached, and defendant will then be free to take all appropriate and necessary action. Should such an eventuality develop, the employee or employees involved would not be protected by section 703(a)(1) of the Act from failures or refusals to hire, discharge, or take other action to protect the efficient conduct of the employer's business.[28]

---

**26.** See Judge Winter's dissenting opinion in *Jordan v. North Carolina National Bank, supra,* 565 F.2d at 76.

**27.** Employees are also unlikely to enjoy any practical benefits in terms of workload from being relieved of the obligation to make these particular decisions, since presumably an equal number of other cases would be assigned to them to make up for any deficiency.

**28.** Similarly, it may well be that, should this plaintiff or some other employee with similar views aspire to an even higher-level supervisory position, undue hardship to the employer's business interests may become more readily apparent (perhaps because of the unavailability or shortage of alternates) notwithstanding a relatively small volume of cases involved. That decision, too, cannot be anticipated on this record.

Third. The government raises a fundamental question of principle. It argues that what is at stake here is the integrity of the Internal Revenue Service and, indeed, of the Nation's uniform tax system itself. Citizens are entitled to have confidence in that Service and that system, and this confidence, so it is claimed, would be jeopardized if plaintiff's insistence on his interpretation of law and public policy were allowed to prevail. The Service also argues in this connection that different standards must be applied to judicial or quasi-judicial officers [29] than to employees who carry out mere ministerial functions, and that any deviation by such an officer from duly promulgated law and policy must be regarded as *per se* inflicting an undue hardship on the government which employs him.

Those arguments would be extremely persuasive, even conclusive, if plaintiff were taking the position that he would deny tax exemptions to organizations to whose policies he objects. Indeed it may be that, at one time in the course of the administrative proceedings, he took that very position. But that is not the posture of this case now. Plaintiff does not assert that he will tailor his decisions to his beliefs but merely that, when there is a conflict between his beliefs and what the law would require him to decide, he will in effect disqualify himself and request that the matter be reassigned to another reviewer.

It is difficult to see how that stand could impair taxpayer confidence in the tax system or the impartiality of the IRS. On the contrary. Decision-makers at all levels not infrequently face conflicts of interest—financial, family-related, or concerning matters of conscience or fixed opinion. Officials are justly criticized when they make decisions notwithstanding interest or bias,[30]

particularly when there is no disclosure. Law and public policy encourage disclosure and disqualification, and public confidence in our institutions is strengthened when a decision-maker disqualifies himself on account of financial interest, insuperable bias,[31] or the appearance of partiality. In a very significant sense, therefore, public policy favors the course of disclosure of bias and disqualification that this plaintiff has chosen, and that course may not be regarded as impairing the integrity of the IRS decision-making function.

The government also suggests that it should not have to accommodate itself to the kind of internal dissent from its policies exemplified by plaintiff's refusal to process applications for tax exemption from abortion clinics. The short answer is that provided in the Civil Rights Act itself which directs that, absent undue hardship to its operations, the Internal Revenue Service, like any other covered employer, must accommodate itself to dissent based on religious belief.

To be sure, some of plaintiff's beliefs may be regarded by many as bizarre (*e. g.,* his concern with witchcraft or worship of the devil, which at least at the present time can hardly be said to constitute a clear and present danger) and some of his language may be strong (*e. g.,* that the Treasury Department "is encouraging mass killing of innocent human beings in many parts of the world," and that the Supreme Court abortion rulings are "based on fraud perpetrated on the Court"), but this does not constitute a valid basis for depriving him or his views of the protection of the First Amendment. The Constitution is designed to shield robust and seemingly eccentric expression and conduct no less than those

---

**29.** It may be assumed that a reviewer with final decision-making authority with respect to many tax exemption applications is in that category.

**30.** Every individual obviously is the product of his education and experience, and he brings to his decisions the baggage of that background, sometimes without even being aware of its existence. Decision-makers must struggle not to

permit such factors to be a burden on their impartiality, and where they recognize its existence and inevitable influence, voluntary disclosure or disqualification are the appropriate remedies.

**31.** See, *e. g., Association of National Advertisers, Inc. v. Federal Trade Commission,* 460 F.Supp. 996 (D.D.C.1978).

which are more mildly conventional (see *Murdock v. Pennsylvania,* 319 U.S. 105, 116, 63 S.Ct. 870, 87 S.Ct. 1292 (1943); *Redmond v. GAF Corp., supra* ) and the Civil Rights Act's religious discrimination provisions incorporate that constitutional standard.

In these respects both the First Amendment and the Act merely mirror the fundamental values of this society, based as it is on pluralism in religion as in many other aspects of life. Mr. Justice Jackson expressed that truth for the Court in *West Virginia State Board of Education v. Barnette,* 319 U.S. 624, 641–2, 63 S.Ct. 1178, 1187, 87 L.Ed. 1628 (1943), in famous words which, while uttered in a slightly different context,[32] are fully applicable here:

. . . We can have intellectual individualism and the rich cultural diversities that we owe to exceptional minds only at the price of occasional eccentricity and abnormal attitudes. When they are . . harmless to others or to the State . . the price is not too great. But freedom to differ is not limited to things that do not matter much. That would be a mere shadow of freedom. The test of its substance is the right to differ as to things that touch the heart of the existing order.

If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein. If there are any circumstances which permit an exception, they do not now occur to us.

■ The government's final argument—that to accept plaintiff's position would be to involve the Internal Revenue Service in religious affairs in violation of the First Amendment's prohibition against the establishment of religion—is simply wrong. IRS would be engaged in an establishment of religion if it were to allow plaintiff to make decisions on behalf of the

government based on his religious beliefs. No such violation of the Establishment Clause occurs, however, when plaintiff is allowed merely to abstain from making decisions on issues which offend his conscience. To do that is to allow him to exercise his religious preference under the Free Exercise Clause without at the same time entangling the government in religious affairs in violation of the Establishment Clause. It thus serves well both aspects of the religious clauses of the First Amendment.

■ For the reasons stated, the Court concludes that there are no grounds of public policy upon which plaintiff could be denied promotional or other employment rights and opportunities. Nevertheless, a word of caution on this aspect of the case may not be inappropriate. The "undue hardship" provision applies not only to the purely mechanical facets of an agency's operations; it is also an integral part of the public policy issues discussed in this part of the Opinion. As indicated, in the view of this Court it is not only permissible but desirable for a decision-maker to disclose his insuperable biases and prejudices and to disqualify himself when they might tend to interfere with the impartial discharge of his duties. Yet if a potential decision-maker has so many conflicts of interests, biases, prejudices, or convictions (whether religious or otherwise) that he would be unable to perform a substantial proportion of the duties of a particular position, then the appropriate authorities may refuse to appoint or promote him to that position. Thus, there is nothing in the Civil Rights Act, the Constitution, or any other law to require the appointment to a position in the Internal Revenue Service of one who in principle objects to income taxation (just as the law does not require the giving of military command to an avowed pacifist or the appointment of an opponent of criminal penalties to a judgeship on a court with

32. The *Barnette* case involved a flag salute requirement imposed by a public school system which was objected to by Jehovah's Witnesses. See also, *Abington School District v. Schempp,*

374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (requirement of prayer recital in public schools unconstitutional).

significant criminal jurisdiction). It is only where, as here, the area of conscientious or other problems leading to potential disqualifications is relatively slight that such problems do not stand as a bar to employment or advancement.[33]

## IV

The government's motion to dismiss the claim which challenges the exemption status of certain organizations will be granted, and its motion for summary judgment with respect to the Title VII claim will be denied, and the case will be scheduled for trial on the remaining issues.

---

**33.** A federal judge must disqualify himself if he has any financial interest in a subject matter in controversy or in a party to a proceeding (28 U.S.C. § 455(b)(4)), but he is not required to divest himself of all financial holdings but must merely "inform himself about his personal and fiduciary financial interests" (§ 455(c) and Can-

on 3, Code of Judicial Conduct). Under these two standards, some disqualifications appear to be inevitable, and are apparently regarded as compatible with the holding of judicial office. Yet a judge presumably would not be justified in so arranging his financial holdings as to maximize the area of potential disqualification.