**Peb ALI, Plaintiff,**

v.

**SOUTHEAST NEIGHBORHOOD HOUSE, Defendant.**

**Civ. A. No. 80–3295.**

United States District Court, District of Columbia.

July 17, 1981.

Willie Mahone, Washington, D.C., for plaintiff.

James Brown, Washington, D.C., for defendant.

## MEMORANDUM OPINION

JOYCE HENS GREEN, District Judge.

Plaintiff, Peb Ali, ("Ali") brings this action against the defendant, the Southeast Neighborhood House ("SENH"), alleging a violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, on the ground that the defendant discriminated against him on the basis of his religion. At the outset, it should be noted that the sincerity with which the plaintiff, a Black Muslim, holds his religious beliefs is undisputed.

Sincere beliefs, meaningful to the believer, need not be confined in either source or content to traditional or parochial concepts of religion. *Welsh v. United States*, 398 U.S. 333, 90 S.Ct. 1792, 26 L.Ed.2d 308 (1970). *See also, United States v. Seeger*, 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965) for the definition of "religious training and belief" as applied to a conscientious objector claim, which definition is no less appropriate here. The Court noted the "vast panoply of beliefs" prevalent in our country and interpreted "the meaning of religious training and belief so as to embrace *all* religions." *Id.*, at 165, 85 S.Ct. at 853 (emphasis added). "Intensely personal" convictions which some may find "incomprehensible" or "incorrect" fit within the framework of "religious belief." As the Court has said,

> Most of the great religions of today and of the past have embodied the idea of a Supreme Being or a Supreme Reality—a God—who communicates to man in some way a consciousness of what is right and should be done, of what is wrong and therefore should be shunned.

*Welsh, supra,* 398 U.S. at 340, 90 S.Ct. at 1796.

Under *Welsh-Seeger* then, as in this case, when logically we apply its rationale to Title VII cases also, the belief is protected if the belief sought to be protected is "religious" in that person's own scheme of things and if it is sincerely held.

The following evidence, stated herein as findings of facts and conclusions of law, developed through trial.

Plaintiff began his employment at the SENH on April 9, 1979, after discussing that possibility with Calvin Lockridge, a member of its Board of Directors ("Board"). After an interview by a panel of the Board, Ali was recommended to the Executive Director of SENH, Laplois Ashford, for the position of Associate Director, Community and Human Resources Division ("CHRD"), which plaintiff accepted. This position required Ali to exercise skills in management and administration over a staff of approximately twenty to twenty-three employees, and to preside over the role of SENH in various areas of the city, including housing and community organization. When plaintiff assumed his position, the Executive Director was aware of his religious beliefs and in fact had met him when both men lived and worked in Chicago, Illinois in the early 1970's.

Soon after he began his employment, Ali experienced difficulties because he felt that certain duties he was required to undertake conflicted with his religious beliefs. Some examination of the circumstances surrounding those matters warrant mention, as they indicate the nature of plaintiff's beliefs as well as his perception of his position, and the interrelationship of his religion, as he saw it, and his employment requirements. The examples are merely illustrative and not intended to be inclusive of all the problems these parties encountered.

One incident concerned a time sheet submitted by a Meredith Gilbert, who commenced employment at SENH as a consultant in the housing area on March 12, 1979 and later, in early May, became Housing Coordinator. When Gilbert submitted his time sheet for hours worked, plaintiff refused to sign the document because he had not seen Gilbert on the premises and therefore thought that he would be acting dishonestly if he verified Gilbert's hours in the absence of this personal observation. Although Ali testified that his own investigation revealed that Gilbert's work was unrelated to SENH, that it involved a political campaign and not work in the CHRD, and that he reluctantly signed the time sheet only because of Ashford's direction, the credible evidence verified Gilbert's employment as a consultant. The Executive Director testified that he did not order Ali to sign the time sheet, that he could have signed the attendance record without Ali's approval, and that, pursuant to his ultimate authority to resolve all such disputes, Ashford decided that the time should be credited. As further evidence made clear, however, this aspect of plaintiff's complaint had little to do with the charge of religious discrimination.

Another series of events concerned the role of Ms. Peggy Jackson and harbored a complicated scenario that began when all employees were informed in early February, 1979, as a result of the Board of Directors' decision, that a major reorganization of SENH was to be undertaken to avert imminent financial crisis. To reformulate the House's mission and to give the Board complete flexibility in deciding upon personnel to fill the staff positions in a differently structured organization, the Board agreed to send each employee a notice of termination and ask that the employee submit a new application for work at SENH. A notice was thereupon given to all employees at a staff meeting in February, with an effective date of February 26, 1979 for termination of employment. The Executive Director testified that there were a number of unqualified people in positions of responsibility at SENH, and Jackson was one of those.

At the time of the notice of terminations, Jackson was a Junior Housing Advisor, having worked at SENH for thirteen years. Plaintiff contends that even before he ac-

quired employment here, and after, he was told to discharge Jackson but was given no work-related reasons for such action. Once again he conducted his own investigation which, he testified, produced evidence that Jackson had only raised the ire of the Executive Director due to a vote she cast in what Ali felt was an unrelated matter involving another community organization. To fire an employee for what Ali thought was a personal reason was violative of his Muslim beliefs and he, therefore, rejected Ashford's decision (as well as the Board's) to terminate Jackson from SENH employment.

Yet plaintiff's testimony is outweighed by the testimony of Ms. Jackson herself. She indicated, and facts fortified this conclusion, that the Board meeting at which she cast the criticized vote was indeed related to her work at SENH. Although Ashford had vested Jackson with what she characterized as "independent discretion," the entire matter was not a personal or political dispute between the Executive Director and her. Plaintiff's individual investigation had again produced incorrect results, yet his refusal to discharge Jackson was premised on those results.

Additionally, the evidence reflected that although Jackson was discharged from her position as Junior Housing Advisor, along with each and every other employee at SENH, she did have substantial problems performing effectively in her position. As the controversy about Jackson increased, she submitted her resignation in late April, effective May 31, 1979. A pervasive problem persisted in plaintiff's Department because the Executive Director had hired Meredith Gilbert to replace Jackson, yet Ms. Jackson was determined to remain in her old office and continue with her duties to the point her resignation took effect. The conflict between Jackson and Gilbert produced considerable tension in the CHRD, and Ali's failure to manage the Department during this dispute, and resolve the difficulties, was one of the significant causes of his discharge. He adamantly refused to follow Ashford's direction that Jackson be fired, and as a compromise, made her a consultant. This solution satisfied neither Jackson nor Gilbert and the matter eventually subsumed most normal responsibilities in CHRD to the point where nothing was being accomplished.

Apart from plaintiff's difficulties over Gilbert's timecard and the continued employment of Jackson, he alleged that his discharge was motivated by the Executive Director's discriminatory attitude towards Ali's Muslim beliefs. A chronology of the final days of Ali's employment at SENH will clarify the evidence concerning this serious complaint.

A meeting was held May 23 at Lockridge's house between Ashford, Gilbert, Ali and Lockridge to attempt to resolve the differences between Ali and Gilbert. While Ashford concurred that Gilbert was a difficult person, he was not the only problem Ali encountered, without resolution, during his brief employment. This session was not effective. On May 25, Ashford initiated another meeting with Ali to discuss procedures in his Department which conference, lasting almost ninety minutes, produced a list of ten specific steps that Ashford directed Ali to undertake to improve the management of CHRD. This list was reduced to writing May 29 in a memorandum from Ashford to Ali, Defendant's Exhibit 6.

Ali was ill and did not appear at work from May 28–30. Because operations at CHRD had reached a standstill, the Executive Director met with that Department's staff on May 30, in Ali's absence. After this meeting, where Ashford was confronted with representations of Ali's managerial incompetence, he deliberated whether to discharge Ali from his position. He concluded then, and later reinforced that determination, that Ali had not implemented any of the procedures discussed and agreed upon at the May 25th meeting: Ali and Gilbert had not reported *together* to Ashford and it was Ali's responsibility to arrange this, Ali had not called a staff meeting to outline the duties of each coordinator, Ali had not assumed control of supportive services immediately, relieving Gilbert

of those responsibilities, and he had not instituted other specified actions aimed at smoothing operations at CHRD. It should be noted that at the May 25 meeting, Ashford had indicated that he would monitor the progress of Ali's Department for ten days, but in the last week of May, Ashford determined that prompter action was necessary for the functioning of the Department.

On May 30, Ali wrote to the Executive Director and mailed to his home address a lengthy personal letter describing his Muslim practices and beliefs and demonstrating his problems at SENH. (Plaintiff's Exh. 7). The plaintiff declared,

I did not come to Southeast Neighborhood House under any false pretence (sic), but as a Muslim dedicated to a cause. If you [Ashford] are as alert about the situations of the world as you seem to be about procedures then you should recognize what I am speaking of, if not you're the one that is in trouble.

Additionally, Ali wrote, "If I do not work toward the goals as outlined by the Holy Quran based on the knowledge given to me then I will be destroyed. I have come too far to allow this to happen." In this letter the plaintiff complained that he had not been given all of the facts needed to lay out proper work responsibilities, and noted a number of special items, such as a debt owed to a local church, about which he demanded to be consulted. The letter begins and ends with quotations from the Holy Quran, and is replete with references to plaintiff's religious ideals.

Ashford received this letter on June 1 when he arrived at his home at about 6:30 p. m. He viewed the letter as an expression of "some deep internal turmoil" in Ali and found it difficult to comprehend. He was upset further by the fact that some of Ali's references to aspects of work at SENH, for example the debt owed to the church, were totally outside of his field of responsibility, and that Ali, as the manager, did not seem to be coping with the problems then existing in the CHRD and which were Ali's responsibility. He interpreted the letter as "an exercise in catharsis," whereby Ali vented his frustrations on Ashford.

On Monday June 4, 1979, Ashford sent Ali a memorandum (Plaintiff's Exh. 9) discharging him from employment with SENH. Ashford informed Ali that his

administrative actions over the past two weeks and the problems which resulted therefrom have led me to conclude that you are either unwilling or incapable of separating personal relationships from professional procedures which are a must if subordinates are to have a clear understanding of what is expected of them in short term and long range programmatic operations.

. . . you have failed to provide decisive directions to your staff, despite agreeing to do so immediately following our conference of May 25 . . . as spelled out in the memorandum of May 29 . . . [which was a followup to the May 23 memorandum.]

Ashford "fully concur[ed]" that Ali "should not be expected to undertake procedures which are foreign to [his] basic nature, beliefs, and committments," and expressed his hope that Ali "can and will be able to find another organization through which [he] can practice . . . Muslim and humanist beliefs."

This memorandum, which Ali received on June 5, was followed on June 6 by another communication from Ashford to Ali outlining in detail his reasons for discharging the plaintiff. Ashford testified that this was a common practice because he thought it only fair to give specific and detailed reasons for dismissing an employee. The reasons included "refusal, unwillingness, and/or negligence" in following instructions discussed at the May 25 meeting, citing examples of noncompliance. The memo also indicated that Ali "interject[s his] religious beliefs in every issue or problem we discuss and the results have been a lack of clear and decisive attention to managerial details. Even more distressing", Ashford said, were Ali's "attempts to impose [his] beliefs and managerial operating style on me and others." Declaring that the "bottom line is whether or not a particular staff member is able to

satisfactorily execute the duties and responsibilities of his position," Ashford described in specific detail his perception of plaintiff's inabilities. This description was buttressed at trial by the Executive Director's credible testimony.

On June 7, Ali wrote Ashford requesting reconsideration of the decision indicating that Ashford had violated the law by firing him on the basis of his religious beliefs. Ashford responded that same day that he would not reconsider and that he had not violated any law. Pursuant to appropriate SENH procedures, Ali appealed the Executive Director's decision and a hearing was held with three Board members: Lockridge, James Brown and JePhunneh Lawrence. Voting 2–1, Lawrence dissenting, the panel affirmed the Executive Director's decision to discharge Ali. While Ali testified that he had heard at this meeting that Ashford stated he had discharged Ali because of his religion, the record is devoid of evidence, despite opportunity to obtain it, that Ashford made any such statement. A recording of the meeting was stolen along with the tape recorder and numerous other items in a burglary at SENH in 1980. Nonetheless, Ashford denied making any such statement, and Lawrence was not even examined on the issue. When plaintiff's counsel attempted to cross-examine Lockridge about the statement, the Court was required to sustain defendant's technical objection because the question was clearly beyond scope of the direct examination, but the Court made a direct suggestion to the plaintiff that he use the opportunity to call Lockridge in rebuttal for exploration of this matter. Plaintiff did not do so.

Plaintiff filed a complaint with the District of Columbia Office of Human Rights, which after a conference with the parties, dismissed the matter finding "no probable cause ... for crediting the complaint." Plaintiff then petitioned the Equal Employment Opportunity Commission ("EEOC") to investigate his complaint and on May 1, 1980, the EEOC determined that there was "no reasonable cause to believe the charge," but pursuant to regulations and statute, forwarded a "right to sue" letter to Ali on September 29, 1980. Plaintiff instituted this action on December 29, 1980.

Title VII prohibits discrimination on the basis of one's religion. 42 U.S.C. § 2000e–2(a) makes it unlawful for an employer "(1) to fail or refuse to hire. or to discharge any individual, or otherwise to discriminate against any individual ... because of such individual's religion." The 1972 amendments to Title VII provided a definition of religion:

> The term "religion" includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.

42 U.S.C. 2000e(j).

> The Supreme Court has determined that:
> The intent and effect of this definition was to make it an unlawful employment practice under § 703(a)(1) for an employer not to make reasonable accommodations, short of undue hardship, for the religious practices of his employees and prospective employees. But ... the statute provides no guidance for determining the degree of accommodation that is required of an employer.

*Trans World Airlines v. Hardison,* 432 U.S. 63 at 74, 97 S.Ct. 2264 at 2271, 53 L.Ed.2d 113 (1977).

Despite this lack of direction, some guideposts have been constructed by courts addressing the duty to make a reasonable accommodation. For example, in *Haring v. Blumenthal,* 471 F.Supp. 1172 (D.D.C.1979), District Judge Harold H. Greene explored the "critical issue [of] whether the level of hardship must be measured by the accommodation of the one employee seeking relief or by the precedent-setting effect of the grant of such relief to him and the conceivable actions of others." *Id.* at 1181. He concluded that to satisfy the statutory requirement, the employer must show *present* undue hardship, as distinguished from anticipated or multiplied hardship.

Unless the statutory mandate is to be rendered meaningless, it must be held to provide that until facts or circumstances arise from which it may be concluded that there can no longer be an accommodation without due hardship, the employee's religious practices are required to be tolerated.

*Id.* at 1182.

■ Additionally, some duty is placed on the employee to reach a reasonable accommodation with his employer once the employer has attempted to accommodate to the individual's beliefs. In *Yott v. North America Rockwell Corp.*, 602 F.2d 904 (9th Cir. 1979), *cert. denied*, 445 U.S. 928, 100 S.Ct. 1316, 63 L.Ed.2d 761, the Court noted that when an employer makes a reasonable accommodation, rejection by the employee might constitute grounds for the employer to demonstrate undue hardship by further accommodation. Quoting a decision by the 8th Circuit, *Chrysler Corp. v. Mann*, 561 F.2d 1282 at 1285 (8th Cir. 1977), the Court declared:

An employee cannot shirk his duties to try to accommodate himself or to cooperate with his employer in reaching an accommodation by a mere recalcitrant citation of religious precepts. Nor can he thereby shift all responsibility for accommodation to his employer. Where an employee refuses to attempt to accommodate his own beliefs or to cooperate with his employer's attempt to reach a reasonable accommodation, he may render an accommodation impossible.

■ The question concerning plaintiff's discharge is whether it was predicated on Ashford's discrimination against Ali's Muslim beliefs or on Ali's failure to execute his work responsibilities satisfactorily. The overwhelming weight of the evidence is that Ali was sorely ineffective as a manager and could not competently perform his duties as described in his position description and prescribed by the Executive Director. It was Ali himself who continuously injected his philosophic and moralistic principles into the day-to-day operation of his Department, invoking the name of religion when challenged on his management of that Department and his failure to obey his employer's clear and insistent directives. The defendant, through its Executive Director, attempted to ignore the allusions to the Quran, and sought to determine the dilemmas and disputes then present in plaintiff's Department on their factual bases, concluding, wholly apart from any perception of the plaintiff's values, that Ali was simply not qualified as a manager for this important Department in SENH.

Ali's testimony at trial provides the strongest evidence that he could not perform his tasks as required and could only do so in the future on *his* conditions. He stated,

I intended to do the things that were in my job description, and the things outlined for me to do as it relates to the Holy Quran, helping remake the world, changing images, changing other things like people's minds and their relationship to each other.

The evidence further demonstrated that Ali did not or could not perform the tasks listed on his job description, Plaintiff's Exh. 1. It also showed that while plaintiff's position at SENH was, in part, to improve SENH's community image, it was not to "remake the world" or to "change people's minds." Important as these matters were to Ali personally, and appropriate as they might seem to be in certain settings to anyone, these ideals collided with his employment's functional necessity to react to SENH business and decisional crises then and there, by directive or compromise. Additionally, Ali's May 30 letter demonstrates a disregard for express, detailed procedures to aid in managerial operations, finding the "situation of the world" more important to SENH than office procedures. The plain fact is, as Ashford's most persuasive testimony reflected, that Ali was incapable of following directions aimed at streamlining his Departmental operations, that he was unable to resolve the dispute between Gilbert and Jackson that had paralyzed work in CHRD, and that he incorrectly interpreted and responded to his job responsibilities, believing

he had been hired exclusively (or chiefly) to improve the image of SENH, rather than manage his Department. Lockridge and Ashford both stressed the importance of good management in overseeing CHRD, Lockridge stating it was the most important quality he looked for in an applicant. Ashford, recalling most of the procedures he directed be implemented on May 25, was clear that his directions had persistently been ignored and that he therefore was justified in discharge of Ali. While plaintiff alleged that Gilbert was the chief problem at SENH, and Ashford testified that Gilbert was a significant problem, the Executive Director was exercising his administrative judgment in concluding that "a good manager could have handled Mr. Gilbert." Taking into account the credibility of the witnesses and the demonstrated situation at SENH, it cannot be said that Ashford's attitude was anything but patient and reasonable.

Ashford's testimony and the documentary evidence submitted supports the conclusion that Ashford was confronted with insurmountable obstacles as he struggled to work with Ali's petulance and resistance. There could be no accommodation. This is not a case where an employee wishes to take a Friday or a Saturday off work to practice his Sabbath, and where the question is presented as to what steps the employer could take to accommodate that scheduling. Difficult as that might be, it is certainly possible, at least in many instances. Rather, our action is one where Ali would impose his personal perception, from conscience, religion, or philosophy, on each and every day-to-day aspect of his employment while ignoring the basic responsibilities of that position. Present at SENH for only eight weeks, through the crescendo of controversy, Ali sought resolution solely by means of *his* ideals: the issue of Gilbert's timecard, the role of Peggy Jackson, the establishment of proper reporting procedures, and the interpersonal incidents within his Department were never answered by effective management. While Ashford had considered other positions at SENH where Ali might be more satisfied, it was determined that none such existed. Ashford testified, and the Court must concur that the evidence so presented, that nothing short of turning over the operation of SENH could have accommodated Ali's beliefs.

■ Here, Ali was able to establish only that his religious belief was sincerely held, that he was employed with the employer's knowledge that he was a Muslim, that he was formally discharged after he wrote a critical letter to his employer which, in part, described his religion and its concepts, and that he thought (erroneously) that someone mentioned he was discharged because of his religion. As recently as March 4, 1981, the Supreme Court, in a termination of employment case predicated on gender discrimination in violation of Title VII, *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, at ——, 101 S.Ct. 1089, 1093–1095, 67 L.Ed.2d 207 (1981), resolved the conflicts in the Circuits concerning the burden of proof borne by a defendant. The Court outlined the basic allocation of burdens and order of presentation of proof presented in title VII cases alleging discrimination, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973): 1) the plaintiff bears the burden of proving by a preponderance of the evidence a prima facie case of discrimination; 2) if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.*, at 802, 93 S.Ct. at 1824; 3) should the defendant carry this burden, the plaintiff is given the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons but were a pretext for discrimination. *Id.*, at 804, 93 S.Ct. at 1825.

The burden of persuasion "never shifts" and the ultimate burden of persuading the court that the defendant intentionally discriminated against the plaintiff remains with the plaintiff at all times. See *Board of Trustees of Keene State College v. Sweeney*, 439 U.S. 24, 25, n. 2, 99 S.Ct. 295, 296, n. 2, 58 L.Ed.2d 216 (1979); *Burdine, supra,* 450 U.S. at 253, 101 S.Ct. at 1093.

We strain to consider in light of his evidence, that the plaintiff, Ali, was even able to establish a prima facie case of discrimination, but that conclusion requires the burden to shift to the defendant to rebut this presumption of discrimination by simply explaining what he has done, *Sweeney*, 439 U.S., at 25, n. 2, 99 S.Ct. at 296, n. 2 by producing clear, admissible evidence that Ali was terminated for a legitimate, nondiscriminatory reason sufficient to allow the trier of fact to rationally conclude that the employment action had not been motivated by discrimination, thereby "rais[ing] a genuine issue of fact as to whether it discriminated against the plaintiff." *Id.* 450 U.S. at 254, 101 S.Ct. at 1094. If the defendant succeeds in carrying this burden, the prima facie presumption raised by plaintiff's initial burden is rebutted. The plaintiff is then given the opportunity to show that the defendant's reasons were not the true reasons for the employment decision—i. e., were pretextual. This might be done "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's preferred explanation is unworthy of credence." *Id.* 450 U.S. at 256, 101 S.Ct. at 1095.

In this litigation, the defendant demonstrated through clear, specific and admissible evidence the reasons for Ali's termination of employment, reasons which were unquestionably legitimate and nondiscriminatory. While Ali was intelligent, articulate and capable for some activity, he was unsuited for the position he served at SENH due to his inability to function as the essential manager and his warrantless refusal to follow through with acknowledged, direct orders of his superior. It was Ali, not his employer, who viewed the plaintiff's problems at SENH from a religious perspective only. It was Ali who articulated his religion when confronted with a task at his workplace, and then declined in the name of that religion to perform that task. It was Ali who conducted unnecessary independent investigations (often with incorrect conclusions due to a failure of facts), then criticizing and rejecting his employer's commands by invocation of conscience and religion. All the while Ali superimposed his judgment for the employer's, accepting that as the only correct basis upon which he could or would perform his employment.

The overriding concern of Congress in enacting Title VII was the elimination of discrimination in employment. Employees are sheltered from bigotry and discrimination emanating from the employer's actions towards that employee's most personal, most cherished religious beliefs and values. These considerations should be viewed by a Court with special sensitivity to their meaningful uniqueness.

■ Ali's religious beliefs enveloped every facet of his life, personal or business. It must be evident that in SENH's employment no "reasonable accommodation," indeed, no accommodation at all, could make way for those religious beliefs as Ali envisioned them: "helping remake the world, changing . . . people's minds and their relationship to each other." Only a complete reversal of the employer-employee roles, with Ali in the former, rather than the latter, might provide the plaintiff the absolute power he requires to satisfy those beliefs.

Accommodation is not abdication. Title VII cannot and will not be so construed.

Accordingly, judgment will be entered in favor of the defendant, Southeast Neighborhood House, and against the plaintiff, Peb Ali, with costs assessed against the plaintiff, each party to bear its own counsel fees.