Diana McGINNIS, Plaintiff,

v.

UNITED STATES POSTAL SERVICE and Harry H. McGannon, Defendants.

No. C–80–3472 TEH.

United States District Court, N. D. California.

Dec. 16, 1980.

Glenn M. Clark, Withy, Miller, Gerstler & Clark, Berkeley, Cal., Diane R. Dickstein, Siegel, Meyers, Siegel, Friedman & Dickstein, Oakland, Cal., for plaintiff.

G. William Hunter, U. S. Atty., Barbara J. Parker, Asst. U. S. Atty., San Francisco, Cal., for defendants.

## MEMORANDUM AND ORDER GRANTING PETITIONER'S MOTION FOR A PRELIMINARY INJUNCTION

HENDERSON, District Judge.

This matter came on for hearing on motion of Petitioner Diana McGinnis for a preliminary injunction enjoining the United States Postal Service (USPS) from terminating her for refusing to distribute draft registration materials. Based on the following findings of fact and conclusions of law, the preliminary injunction is granted.

## I. BACKGROUND

The relevant facts are not substantially in dispute. Pursuant to an agreement between the Postal Service and the Selective Service System, the Postal Service provides assistance in registering young men for the draft. Specifically, postal window clerks are required to provide potential registrants with blank registration forms; accept completed forms; request identification and attempt to verify the name and birthdate from the identification provided; and request that illegible forms be redone and unsigned forms be signed. Window clerks are not allowed to refuse a tendered form for any reason.

Petitioner McGinnis has worked for the Postal Service for 10 years. She is currently with the Berkeley Post Office, classified as a full-time window clerk. The great majority of work available to employees in that classification is window work, but window clerks perform some other tasks as well.

As a window clerk, Petitioner received the standard training in handling draft registration forms. Thereafter, on July 21, 1980, she notified Postmaster McGannon of her conscientious objection to processing the forms, based on her opposition to conscription and war. The Postmaster advised Petitioner that he expected her to perform the registration tasks and that refusal to do so could jeopardize her job.

Thereafter, Petitioner apparently avoided any direct confrontations by referring requests for draft forms to other windows. On July 28, 1980, however, Postmaster McGannon observed her attempt to refer a potential registrant to another window and ordered that she herself give out the form. When Petitioner refused, the Postmaster sent her home on administrative leave, indicating again that she was jeopardizing her job.

The following day, Petitioner reported to work at non-window duty, as had previously been scheduled. She was approached by another supervisor, who asked her whether, if placed at a window, she would provide registration services. When Petitioner said she would not, the supervisor served her with a 30-day notice of dismissal.

During the following weeks, Petitioner and her counsel, in addition to initiating a union grievance and internal Postal Service Equal Employment Opportunity (EEO) procedures, apparently attempted to negotiate some accommodation with the Postal Service—all to no avail. The day before her scheduled dismissal, Petitioner applied to this Court for a temporary restraining order enjoining the firing. At hearing, the Postal Service graciously agreed to retain Petitioner in her position pending a fuller hearing and the Court's ruling on the present motion for a preliminary injunction.

Petitioner argues that her imminent dismissal will violate her First Amendment right to free exercise of religion, her Fifth Amendment right to equal protection, and her statutory right under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–16, to freedom from religious discrimination in employment.

## II. PETITIONER'S RELIGIOUS BELIEF

At the outset, as a preliminary factual matter, the government questions whether Petitioner holds a bona fide religious belief. If she does not, there can be nothing on which to base a claim of religious discrimination under either the First Amendment or Title VII. *E. g., Sequoyah v. TVA*, 620 F.2d 1159 (6th Cir. 1980) (First Amendment); *Hansard v. Johns-Manville Products Corp.*, 5 FEP Cases 707 (E.D.Tex. 1973) (Title VII). To be bona fide, a belief must be "sincerely held" and, within the believer's "own scheme of things," religious. *Welsh v. United States*, 398 U.S. 333, 339, 90 S.Ct. 1792, 1796, 26 L.Ed.2d 308 (1970); *United States v. Seeger*, 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965). But if the belief asserted is "merely a matter of personal preference" and not "one of deep religious conviction, shared by an organized group," it will not be entitled to protection.

*Wisconsin v. Yoder*, 406 U.S. 205, 216, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15 (1972).[1]

The Court finds that Petitioner has made a sufficient showing that her asserted religious belief is indeed bona fide. Petitioner has a long family history of involvement with the Society of Friends and states that she is a long-time attender of Friends Meetings. Her father and brother were both given conscientious objector status during previous drafts. Although not a formal member of any Society Meeting, Petitioner asserts that since childhood she has been trained in and has followed the Peace Testimony of that group. The Peace Testimony, a central document of the Quaker religion, expressly opposes war and militarism of all sorts. Petitioner swears that her belief is a sincerely and deeply held religious conviction. Particularly since Petitioner is willing to jeopardize her job in support of that belief, this Court has little occasion to question her assertion. *See Fowler v. Rhode Island*, 345 U.S. 67, 70, 73 S.Ct. 526, 527, 97 L.Ed. 828 (1953).

### III. JURISDICTION

#### A. *Constitutional Claims*

More difficult issues are raised by the government's contention that this Court lacks jurisdiction to provide any relief at this stage of the case. First, it is well established that Title VII provides the exclusive judicial remedy for discrimination in federal employment. *Brown v. GSA*, 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976). Thus, despite Petitioner's attempt to characterize part of her claim as something other than employment discrimination, this Court is not persuaded that it has jurisdiction to entertain Petitioner's constitutional claims. *See, e. g., id.; Guilday v. DOJ*, 451 F.Supp. 717, 724 (D.Del.1978). In any event, since the Court concludes below both that it has jurisdiction to provide injunctive relief on Petitioner's Title VII claim and that such relief is appropriate in this case, we need not reach Petitioner's constitutional claims.

#### B. *Title VII Claim*

The question whether this Court has jurisdiction to grant an injunction in the present posture of Petitioner's Title VII claim is a thorny one. Section 717 of the Equal Employment Opportunity Act of 1972 provides in relevant part that an aggrieved federal employee may file a civil action "after one hundred eighty days from the filing of the initial charge with the department, agency, or unit ...." 42 U.S.C. § 2000e–16(c). Here, Petitioner has admittedly not waited the requisite 180 days before filing her action for injunctive relief. The government therefore argues that this Court lacks subject matter jurisdiction because Petitioner has not exhausted her administrative remedies.

Fulfillment of Title VII's 180-day waiting period has generally been regarded as a prerequisite to the assumption of jurisdiction by a district court. *E. g., Eldredge v. Carpenters 46 Northern California Counties Joint Apprenticeship and Training Committee*, 440 F.Supp. 506, 515 (N.D.Cal.1977); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 798, 93 S.Ct. 1817, 1822, 36 L.Ed.2d 668 (1973). Accordingly, some courts have construed the 180-day requirement strictly. *E. g., Troy v. Shell Oil Co.*, 378 F.Supp. 1042 (E.D.Mich.1974), *appeal dismissed as moot*, 519 F.2d 403 (6th Cir. 1975). Others, however, have taken jurisdiction over arguably premature actions for preliminary relief in special circumstances. *E. g., Drew v. Liberty Mutual Insurance Co.*, 480 F.2d 69 (5th Cir. 1973). Although courts continue to be divided on the availability of injunctive relief in Title VII cases prior to administrative action or the running of the 180-day waiting period, the law of this Circuit is stated in *Berg v. Richmond Unified School District*, 528 F.2d 1208 (9th Cir. 1975):

1. Although *Welsh, Seeger*, and *Yoder* were not decided under Title VII, their principles seem equally applicable to cases decided under that statute. *See* 42 U.S.C. 2000e(j); *Redmond v. GAF Corp.*, 574 F.2d 897, 901 n.12 (7th Cir. 1978); *Brown v. Pena*, 441 F.Supp. 1382, 1384 (S.D.Fla.1977).

In a limited class of cases such as this one, in which there exist both a high probability of the claimant's ultimate success on the merits and the threat of irreparable injury of the sort which the Act seeks to avoid, a Title VII claimant may personally bring suit to maintain the status quo pending disposition by the EEOC of the underlying charge of discrimination.

*Id.* at 1211.

The government attempts to distinguish *Berg* on several grounds. First, the government argues that *Berg*'s authorization of a preliminary injunction despite the petitioner's failure to wait the requisite 180 days could have been based on the Constitution or a statute other than Title VII. The plain language of the opinion indicates otherwise: The court specifically held that "the district court had subject matter jurisdiction under Title VII itself to reach the merits of the preliminary injunction issue." *Id.*

The government also argues that *Berg* is distinguishable because it involved suit against a private rather than federal employer. It is true that relief against private and federal employers is authorized by different sections of Title VII enacted at different times. *Compare* 42 U.S.C. § 2000e–5 *with id.* § 2000e–16. And, as noted above, the Supreme Court has held that unlike the private employment area, federal employment discrimination can be remedied only through Title VII *Brown, supra.* Indeed, one of the considerations that brought the *Brown* Court to that conclusion was the extensive nature of the remedial scheme that Congress authorized for federal employees in the Equal Employment Opportunity Act of 1972. *See* 425 U.S. at 828–33, 96 S.Ct. at 1965–1968; 42 U.S.C. § 2000e–16.

Nevertheless, *Brown* is not persuasive authority for the proposition that federal employees may not seek preliminary relief under Title VII in situations where private employees might do so. A principal goal of Congress in including federal employees within the protection of Title VII was to give those public employees the same rights in the courts as are available to private employees under the statute. *Chandler v. Roudebush*, 425 U.S. 840, 841, 96 S.Ct. 1949, 1950, 48 L.Ed.2d 416 (1976); *Parks v. Dunlop*, 517 F.2d 785, 787 (5th Cir. 1975). Nothing in *Brown* is to the contrary. Indeed, having restricted the avenues of relief available to federal employees, *Brown* suggests that § 2000e–16 should be broadly construed to provide federal employees the fullest range of remedies available under Title VII.

In addition, it should be noted that Title VII expressly authorizes the Equal Employment Opportunity Commission (EEOC) to seek injunctive relief on behalf of aggrieved employees. 42 U.S.C. § 2000e–5(f)(2).[2] The unavailability of such immediate, EEOC-instigated relief to federal employees—who must instead generally pursue internal agency EEO procedures—is further indication that federal employees should be allowed to seek injunctive relief *on their own* during the 180-day administrative exhaustion period.

The government also apparently urges this Court to question the soundness, at least as applied to this case, of the *Berg* rule authorizing employees to seek injunctive relief prior to administrative exhaustion under Title VII. A few cases, including some recent ones, have indeed held contrary to *Berg*. *E. g., Doerr v. B. F. Goodrich Co.*, 484 F.Supp. 320 (N.D.Ohio 1979). Nevertheless, this Court is persuaded that *Berg* remains the better rule and good law in this Circuit. As a general matter, it has long been recognized that a federal court has jurisdiction to grant injunctive relief pending administrative disposition when that court is directed by statute to make the final decision in the case. *See FTC v.*

2. Indeed, several courts that have declined jurisdiction in private employment cases have reasoned in part that congressional authorization of EEOC suits for injunctive relief indicates a congressional intent to preclude private suits for injunctive relief. *E. g., Troy v. Shell Oil Co., supra,* 378 F.Supp. at 1047.

*Dean Foods Co.,* 384 U.S. 597, 603, 86 S.Ct. 1738, 1742, 16 L.Ed.2d 802 (1966); *Mead v. U. S. Fidelity & Guaranty Co.,* 442 F.Supp. 102, 107 n.1 (D.Minn.1977).[3]

Moreover, application of the *Berg* rule is specifically appropriate in this case. First, Petitioner is here merely attempting to maintain the status quo pending an opportunity to have her claim fully heard on the merits. Second, and more importantly, it should be noted that the purpose of the 180-day waiting period is largely to promote dispute settlement through administrative procedures and conciliation, without resort to litigation. *See, e. g., Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 44, 94 S.Ct. 1011, 1017, 39 L.Ed.2d 147 (1974). Here, however, any conciliation is unlikely. The positions of the parties seem fully hardened. And, significantly, Petitioner's affidavits indicate that the Postal Service's EEO Branch is unlikely even to reach this case within 180 days. *See Vanguard Justice Society, Inc. v. Hughes,* 471 F.Supp. 670, 686 (D.Md. 1979). Thus, forcing Petitioner to wait the statutory 180-day period before filing even for preliminary relief would be an empty formalism.

Accordingly, the Court holds that, on the circumstances of this case, jurisdiction over Petitioner's prayer for preliminary injunc-

tive relief is proper despite her failure to await the running of the 180-day conciliation period.[4]

## IV. APPROPRIATENESS OF INJUNCTIVE RELIEF

■ The usual standard for granting preliminary injunctive relief in this circuit is as follows:

> One moving for a preliminary injunction assumes the burden of demonstrating either a combination of probable success and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tip sharply in his favor.

*Wm. Inglis & Sons Baking Co. v. ITT Continental Baking Co.,* 526 F.2d 86, 88 (9th Cir. 1975). Subsequent cases makes clear that the test is more a continuum than two separate tests. *See Benda v. Grand Lodge of the International Assn. of Machinists & Aerospace Workers,* 584 F.2d 308, 314–15 (9th Cir. 1978). *Berg,* however, suggests a more restricted inquiry for cases such as the present one. The Ninth Circuit there referred to "both a high probability of the claimant's ultimate success on the merits and the threat of irreparable injury . . . ." 528 F.2d at 1211.[5]

---

3. For an extensive presentation of this argument in support of exercising jurisdiction over claims for preliminary injunctive relief under Title VII, see Ashton, *The Availability of Preliminary Injunctive Relief to Private Plaintiffs Pending Equal Employment Opportunity Commission Action Under Title VII of the Civil Rights Act of 1964,* 8 Loy.Chi.L.J. 51 (1976). Further support for this view can be found in L. Jaffee, *Judicial Control of Administrative Action* 677–86 (1965).

4. The language of *Berg* indicates that jurisdiction is proper only where injunctive relief itself would be appropriate. *See* 528 F.2d at 1211; *Eldredge, supra,* 440 F.Supp. at 516 n.8. For the sake of clarity, we consider the appropriateness of injunctive relief separately in Part IV, *infra.*

5. At least one court has read *Berg* as precluding the use of the expanded "continuum" test in suits seeking injunctive relief under Title VII prior to administrative exhaustion. *See McCarthy v. Cortland County Community Action Program, Inc.,* 487 F.Supp. 333, 339 n.4

(N.D.N.Y.1980). It should be noted, however, that *Berg* was decided *before* the Ninth Circuit's more liberal approach to granting preliminary injunctions was fully articulated or developed. *See Benda, supra.* Moreover, in a context somewhat different from the present one, the Ninth Circuit has indicated that the "usual tests for a preliminary injunction apply to employment discrimination cases." *Anderson v. United States,* 612 F.2d 1112, 1116 (9th Cir. 1980). (*Anderson* is not directly on point, however, since the court there expressly put aside any consideration of whether petitioner had exhausted her administrative remedies. *Id.* at 1114.) For a cogent argument urging application of the "continuum" test (or "reformulated equity" standard) to cases such as the present, see Richards, *Preliminary Relief in Employment Discrimination Cases,* 66 Ky.L.J. 39, 41–50, 64–66 (1977).

In any event, since the Court concludes below that Petitioner has demonstrated both a high probability of success on the merits and a threat of irreparable injury, we need not look beyond the factors mentioned in *Berg.* We

A. *Likelihood of Success on the Merits*

Title VII provides that all personnel actions affecting federal employees, including those of the U. S. Postal Service, "shall be made free from any discrimination based on . . . religion . . . ." 42 U.S.C. § 2000e–16(a). In the 1972 amendments to Title VII, Congress added the following definition:

(j) The term "religion" includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business.

42 U.S.C. § 2000e(j), Pub.L.No. 92–261, § 2(7).

■ The leading case interpreting § 2000e(j) has noted that the statute makes it unlawful "for an employer not to make reasonable accommodations, short of undue hardship, for the religious practices of his employees . . . ." *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 74, 97 S.Ct. 2264, 2271, 53 L.Ed.2d 113 (1977). Plaintiff has the initial burden of showing a bona fide belief and that the conduct required by the defendant is contrary to that belief.[6] Thereafter, the burden shifts to defendant to demonstrate that it made good faith efforts to accommodate plaintiff's religious belief; and, if unsuccessful in those efforts, that defendant was unable reasonably to accommodate plaintiff's belief without undue hardship. *Burns v. Southern Pacific Transportation Co.*, 589 F.2d 403, 405 (9th Cir. 1978); *Anderson v. General Dynamics Convair Aerospace Division*, 589 F.2d 397, 401 (9th Cir. 1978). The precise content of "undue hardship" and "reasonable accommodation" depend largely on the circumstances of the individual case. *See id.*

The circumstances of the present case indicate that the government is quite unlikely to be able to meet its burdens. First the affidavits from both sides show that the Postal Service made virtually no effort to accommodate Petitioner's beliefs. The government offers little explanation why it did not even try to negotiate an arrangement that would, for example, have enabled Petitioner to work at a window not used for registration materials.[7] Thus, Defendant is unlikely to meet its burden of showing good faith effort to accommodate Petitioner's beliefs. *See Burns, supra,* 589 F.2d at 405–06.

Neither does the government's evidence seem sufficient to meet its burden of showing that the Postal Service was unable reasonably to accommodate Petitioner's beliefs without undue hardship. *See id.* Petitioner has presented evidence, and the government does not dispute, that other postal workers opposed to processing draft registration materials have been accommodated by the Postal Service at other locations. *See Minkus v. Metropolitan Sanitary District of Greater Chicago*, 600 F.2d 80, 82–83 (7th Cir. 1979).

Accommodation of others is, of course, not compelling indication by itself that Petitioner could have been accommodated without undue hardship. Nevertheless, the specific circumstances of Petitioner's employment strongly suggest that adjusting her assignments and/or schedule would not involve an undue burden on the Postal Service. It should be noted first that Petitioner's practice, prior to being sent home by her supervisor, of simply referring registrants to another window apparently created no major disturbance. Petitioner stated

---

note, however, that we would reach the same result (and perhaps more easily) under the "continuum" test. In particular, we would find—based on the factors discussed in Part IV(A), *infra*, the fact that petitioner continues to perform satisfactorily the job she has held for ten years, and the sensitive nature of the rights involved here—that the balance of hardships tips sharply in Petitioner's favor. *See Wm. Inglis & Sons Baking Co., supra,* 526 F.2d at 88.

6. As suggested in Part II, *supra*, Petitioner has clearly made such a showing.

7. It is worth noting here that Congress enacted § 2000e(j) specifically to overturn case law in favor of an employer who "had not made any effort whatsoever to accommodate the employee's religious needs." *Hardison, supra,* 432 U.S. at 74 n.9, 97 S.Ct. at 2272 n.9.

that she turned away only about five registrants per day during the course of the registration period.

The government, however, raises various hypothetical burdens on the Postal Service. In particular, the government suggests that under normal scheduling, Petitioner might have to be the only window clerk at a given station. Petitioner counters, effectively, that she has never been assigned to a post office where there was but one window clerk. It seems highly unlikely to this Court that the Postal Service could not easily avoid such a situation in the future.

In addition, the government argues essentially that a holding for Petitioner here would create a "slippery slope" leading to undue hardship. The government raises the specter of numerous other postal workers making similar requests and of the courts regularly meddling in the Postal Service's personnel administration. While we disdain excessive interference in the Postal Service's internal processes, and while the possibility of future disruption may be relevant to a court's inquiry in evaluating "undue hardship," Defendant must present something more than mere speculation about what other employees might do. The Ninth Circuit has rejected similar speculation, noting that defendant's burden includes a more concrete showing of "actual imposition on co-workers or disruption of the work routine." *Burns, supra,* 589 F.2d at 407.[8]

Finally, in assessing the government's claim of undue hardship, the Court is quite impressed that Petitioner has the full support of her union.[9] Moreover, Petitioner notes that, to her knowledge, none of her immediate co-workers was offended or angered by her actions, and several were openly supportive. Where those who would bear the major burden of any accommodation apparently favor that accommodation, this Court is especially reluctant to accept defendant's assertion of undue hardship.

In sum, based on the government's failure even to attempt an accommodation of Petitioner's beliefs and on the likelihood that the Postal Service could reasonably arrange some accommodation without undue hardship, the Court concludes that Petitioner has demonstrated at least a high probability of ultimate success on the merits of her Title VII claim.

B. *Threat of Irreparable Injury*

The Court also concludes that Petitioner has made a sufficient showing of a threat of irreparable injury to entitle her to injunctive relief. *See Berg, supra,* 528 F.2d at 1211–12. On account of her adherence to her strong religious convictions, Petitioner would here be losing a job she has held for ten years and continues to perform satisfactorily. Of course, where a discharged employee can be compensated with reinstatement and back pay, there is generally no irreparable injury and preliminary injunctive relief is normally not appropriate. *See Sampson v. Murray,* 415 U.S. 61, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974); *Anderson v. United States,* 612 F.2d 1112 (9th Cir. 1979). However, this is not the normal case.

---

**8.** *See Haring v. Blumenthal,* 471 F.Supp. 1172, 1180–82 (D.D.C.1979). In a situation similar to the one presented here, *Haring* rejected the government's contention that it would pose an undue hardship to allow an IRS tax lawyer to disqualify himself from decisions contrary to his religious beliefs. Regarding speculative disruption asserted by the government, Judge Harold Greene aptly noted that

"undue hardship" must mean *present* undue hardship, as distinguished from anticipated or multiplied hardship. Were the law otherwise, any accommodation, however slight, would rise to the level of an undue hardship because, if sufficiently magnified through predictions of the future behavior of the employee's co-workers, even the most minute accommodation could be calculated to reach that level.

*Id.* at 1182.

**9.** Affidavit of Jack Watkins, President of East Bay Local of the American Postal Worker's Union. Indeed, Mr. Watkins declared that the Union "would be more than happy to make the necessary work rule or seniority adjustments that might be required to effect . . . an accommodation." *Id.* at 3. This unqualified union support stands in stark contrast to the situation in, for example, *Trans World Airlines, Inc. v. Hardison, supra. See* 432 U.S. at 68, 97 S.Ct. at 2268.

First, in *Berg, supra,* the Ninth Circuit noted that "the existence of irreparable injury may in appropriate circumstances be presumed, for the purposes of preliminary injunctive relief, from the district court's preliminary determination that Title VII has been violated." 528 F.2d at 1212 n.6 (citing *Culpepper v. Reynolds Metal Co.,* 421 F.2d 888, 894–95 (5th Cir. 1970)).[10] As set out in the preceding section, the Court is persuaded that Petitioner has made a sufficiently strong showing of likely success on the merits for the Court to make a preliminary determination that Title VII has been violated. Indeed, the injury to Petitioner here is probably just "of the sort which the Act seeks to avoid . . . ." 528 F.2d at 1211.

Moreover, it has often been held that the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976); *see, e. g., McCormick v. Hirsch,* 460 F.Supp. 1337, 1349 (M.D.Pa.1978) (irreparable injury found and injunction granted where substantial showing that First Amendment religious freedom rights would be infringed); 11 C. Wright & A. Miller, Federal Practice & Procedure § 2948, at 440 & n.39 (1973 & Supp.1980). The application of this principle to the present case requires an investigation of Petitioner's claim that her dismissal violates her First Amendment right to free exercise of religion.[11]

We begin with the proposition that "only those [governmental] interests of the highest order and those not otherwise served

can overbalance legitimate claims to the free exercise of religion." *Wisconsin v. Yoder,* 406 U.S. 205, 215, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15 (1972); *see Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). The government argues that since it is well established that there is no First Amendment right to refuse to register for the draft, *e. g., United States v. Bigman,* 429 F.2d 13, 15 (9th Cir. 1970); *Richter v. United States,* 181 F.2d 591 (9th Cir. 1950), then *a fortiori* there can be no First Amendment right to refuse to distribute registration materials.

The Court finds the government's reasoning unpersuasive. The cases relied on by the government need not be read as holding that the requirements of the draft contain no restriction on the free exercise of religion, but rather that the burden of such restrictions is outweighed by critical governmental interests. *See United States v. Toussie,* 410 F.2d 1156, 1161 (2d Cir. 1969), *rev'd on other grounds,* 397 U.S. 112, 90 S.Ct. 858, 25 L.Ed.2d 156 (1970). *See also United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). Thus, for example, in *Richter, supra,* the Ninth Circuit emphasized the importance of conscription to national security, reasoning that "a failure to register manpower of the country would be a failure to provide for the common defense." 181 F.2d at 593.

Here, the government interest is different—and considerably weaker. As suggested above, accommodation of Petitioner, while involving some minor administrative adjustments, is unlikely to interfere materi-

---

10. *Berg's* reliance on *Culpepper, supra,* seems misplaced since the *Culpepper* court was referring to the situation in which the statute preliminarily held to have been violated expressly authorizes the injunctive relief sought. *See* 421 F.2d at 894–95; *United States v. Hayes International Corp.,* 415 F.2d 1038 (5th Cir. 1969); *Richards, supra* note 5, at 43, 64–65. Nevertheless, a presumption of irreparable injury may similarly be appropriate here since Title VII favors delay of the opportunity for statutory relief primarily for the purpose of promoting administrative conciliation; and since, as discussed above, conciliation is quite unlikely in this case, the statutory purpose in any delay is dissipated.

11. It is settled that, as a procedural matter, Congress intended Title VII to provide the exclusive judicial *remedy* for employment discrimination. *See Brown v. GSA, supra.* However, we do not read *Brown* to mean that Congress, in enacting Title VII, intended to diminish in any way the law's view of the gravity of the injury sustained. Thus, while we may be precluded from considering Petitioner's First Amendment claim directly on the merits, the Court does not consider itself precluded from considering Petitioner's First Amendment claim in evaluating the appropriateness of injunctive relief.

ally with the process of registration. Petitioner is not in the position of a young man who, for proper administration of the system, must register before his claim of conscientious objection can even be heard (if necessary). Instead, Petitioner has been required, as a condition of employment, to participate directly in the facilitation of a process inimical to her religious beliefs. Her conviction that her participation constitutes complicity, albeit somewhat attenuated, is sufficiently strong that she is willing to risk her job rather than compromise her beliefs. This Court is in no position to tell her that her religious objection is too trivial and remote to warrant protection in the face of the Postal Service's administrative convenience.[12]

Accordingly, the Court finds that Petitioner has made a sufficient showing of a threat of irreparable injury to merit injunctive relief.

## V. CONCLUSION

Ms. McGinnis's religious views on conscription may be unpopular to many; and her refusal to process draft registration forms, based upon those views, probably poses some inconvenience to the Postal Service. But recognizing that concrete safeguards on the freedom to exercise one's religion are essential to give life to abstract principles of toleration, Congress has directed that where beliefs such as Petitioner's can be accommodated without undue hardship, they should be accommodated. In light of that mandate, for the reasons set out above, the preliminary injunction is granted.

SO ORDERED.

---

12. We need not hold here that, as a matter of law, Petitioner's First Amendment rights have been violated. The Court does conclude, however, that Petitioner has adequately demonstrated the possibility of interference with her right to free exercise of religion, particularly when considered in the context of the apparent violation of her Title VII rights, to raise a sufficient threat of irreparable injury.