**CITICORP SERVICES INC., Plaintiff,**

v.

**Roxani M. GILLESPIE, Commissioner, California Department of Insurance, Defendant.**

**No. C–88–3316 RFP.**

United States District Court, N.D. California.

March 2, 1989.

John F. Barg, Landels, Ripley & Diamond, San Francisco, Cal., for plaintiff.

Calvin J. Abe, Deputy Atty. Gen., San Francisco, Cal., for defendant.

PECKHAM, District Judge.

## I.  INTRODUCTION

In this proceeding, Citicorp Services Inc. ("CSI") challenges the constitutionality of California Insurance Code Section 12413 ("statute") that regulates when California escrow accounts may disburse proceeds received by check or certain other forms of negotiable instruments.  In essence, the statute provides that escrow accounts must hold checks drawn on out-of-state banks ("out-of-state checks") until they clear but may distribute the proceeds of checks drawn on in-state banks ("in-state checks") as soon as they are deposited into the escrow account.  If the out-of-state institution can demonstrate to the defendant Insurance Commissioner ("Commissioner" or "Department") that it can meet the requirements of a four-part test prescribed by a recent amendment, however, escrow accounts may distribute the proceeds from out-of-state checks immediately upon deposit as they can with in-state checks.

CSI asserts that this facially differential treatment of in-state and out-of-state financial institutions violates the Commerce Clause.  In this motion, they move for a preliminary injunction enjoining the enforcement of the statute as well as declaratory relief in the form of an order that the statute is unconstitutional.  At the same time, the defendant Insurance Commissioner moves to dismiss the action for failure to state a claim.  She argues that since she approved CSI's application under the four-part test CSI has not suffered any harm and thus no case or controversy has been presented to the court.

## II.  BACKGROUND

### A. *CSI Financial Services and the Statutory Scheme*

CSI is a New York Corporation that provides fund transfer services through its "Citicorp Remittance Service" (CRS) to financial institutions throughout the United States and in many foreign countries.  In particular, CRS provides customer banks and savings and loan associations with a Citibank (New York State) zero-balance checking account on which they may draw funds and make payments, similar to a business checking account.[1]  Prior to Janu-

---

1.  In contrast to a traditional checking account, CRS allows financial institutions to write checks on Citicorp accounts even though the institutions writing the checks do not have account balances at Citibank.  When using CRS, the financial institution writing the check is contractually obligated to repay Citicorps for the funds advanced, plus a fee.  This system, known

ary 1, 1985, non-Californian customer banks and savings and loans utilized CRS to make California transactions in excess of one billion dollars.

On January 1, 1985, California Insurance Code Section 12413 became effective. As originally enacted, the statute provided that escrow accounts may disburse the proceeds from "items" [2] or "drafts" ("checks") drawn on in-state banks once the checks have been received or deposited into the escrow account. CAL.INS.CODE § 12413(a). In contrast, the statute prohibited escrow accounts from disbursing the proceeds from checks drawn on out-of-state banks until those funds "become available for withdrawal as a matter of right from the financial institution to which the deposit was made." CAL.INS.CODE § 12413(c). Thus, under the statutory scheme, an escrow account could disburse the proceeds of an in-state check immediately upon deposit into the escrow account but had to wait as long as seven days to disburse the proceeds from an out-of-state check.[3]

According to plaintiff, the statute had the predictable effect of virtually eliminating the use of out-of-state financial instruments in California escrows. As a practical matter, escrow accounts evidently refused to accept the delays attendant to acceptance of out-of-state checks. Plaintiff's Memorandum at 10. Although checks drawn on out-of-state banks constitute only five percent of all checks presented to California escrows, CSI apparently

accounts for virtually all of these transactions and suffered more than a fifty percent decline in the dollar value of CRS check transactions in California after the statute became effective.

After sponsorship and vigorous lobbying by CSI and over the opposition of the defendant Insurance Commissioner, the legislature amended the statute effective January 1, 1988 by exempting out-of-state checks from the prescribed waiting period if the Commissioner found that the financial institution could meet a four-part test.[4] Gordon Declaration ¶ 7. The fourth prong of this test required applicants to demonstrate "on the basis of verifiable information" that the checks would "be collected by depository banks within the same time or less as generally occurs for items drawn on California institutions." 12413(c). The amendment did not change the provisions concerning disbursement of proceeds from in-state banks. Thus, as currently drafted, out-of-state financial institutions must demonstrate that their checks meet the four conditions to be exempted from the waiting period even though no requirements are placed on in-state financial institutions. In particular, CSI must demonstrate that its checks will be collected (i.e. "clear") within the same time frame "as generally occurs" for in-state checks even though California checks need not demonstrate that they will be collected in that period or any particular period of time.

as "zero-balance" checking, is evidently particularly useful in funding escrow accounts.

2. The statute defines an "item" as any "check (including a cashier's check), negotiable order of withdrawal, share draft, traveler's check, or money order." INS.CODE § 12413(g).

3. The statute deems proceeds "available as a matter of right" when (1) final settlement has occurred or (2) upon expiration of the holding period as established by regulation. INS.CODE 12413(d). Although the parties have disputed in correspondence the appropriate regulations specified under the latter standard, the defendant does not dispute that the statute forces an escrow account to wait before disbursing the proceeds of an out-of-state check even though it may disburse the proceeds from an in-state check upon receipt.

4. The 1988 amendment exempted from the provision mandating the waiting period "any category of checks which has been found by the commissioner, in response to an application" to meet the following conditions: "(1) to be drawn by a financial institution insured by the Federal Deposit Insurance Corporation or the Federal Savings and Loan Insurance Corporation, (2) to qualify for use in interbank settlements in accordance with Section 4211 of the Commercial Code, (3) to be drawn on an insured bank which is located in a Federal Reserve City ..., and (4) to be shown on the basis of verifiable information to be collected by depository banks within the same time or less as generally occurs for items drawn on California institutions."

## B. *Background of Dispute*

After CSI applied for exemption from the statute's restrictions, the Commissioner found that its checks satisfied the four-part test and approved their exemption. In doing so, the Department accepted that CSI's two-day collection period was generally comparable to the collection period of in-state banks. *See*, Plaintiff's Attachment E to the Gordon Declaration. The approval, dated April 6, 1988, was "effective immediately" and expressly relieved CSI of any obligation to again demonstrate compliance with the fourth prong of the test: the check-clearing standard. Plaintiff's Exhibit F to the Gordon Declaration. The Department also advised CSI to submit its renewal application demonstrating compliance with the other three prongs of the test between January 1 and March 31 of each year. *Id.*

During the following summer, however, the Department reconsidered its determination that CSI had satisfied the fourth prong of the test and was thus entitled to an exemption. On August 3, 1988, the Department notified CSI by letter "that the time in which proceeds of items drawn on California financial institutions are generally collected is *one* day." Plaintiff's Attachment H to the Gordon Declaration. According to this Department letter, the major banks in California, the California Bankers Association, the California Bankers Clearing House, and other in-state interested parties had supplied additional information that led to the Department's issuance of a "Notice" dated July 26, 1988 indicating the change. *Id.* In light of the revised one-day standard, the Department continued, CSI was no longer in compliance with the statute, and the Department would delete its name from the list of approved financial institutions by August 17, 1988—less than two weeks after CSI received the letter—unless CSI could demonstrate compliance. The Department has never claimed or suggested that use of CSI's financial instruments actually delayed closing of escrow transactions, or that an escrow had been, or could be, affected adversely by use of those instruments.

On August 16, 1988, CSI filed its complaint against the Department and immediately sought a temporary restraining order enjoining defendant from enforcing the terms and conditions of the July 26 "Notice" and August 3 letter. At that time, plaintiff argued chiefly that the July 26 statement by the Department regarding the collection period constituted a regulation and thus the Department violated the Due Process Clause and the California Administrative Procedure Act, Government Code Section 11340, *et seq.*, by its actions. At the August 17 hearing before Judge Zirpoli, the court was not required to rule on the merits of plaintiff's position. The Commissioner stipulated that she would take no action to enforce the terms of the July 26 "Notice" pending the outcome of a preliminary injunction hearing set for September 21, 1988. Prior to the hearing, moreover, defendant agreed to withdraw the July 26 statement and August 3 letter. In the September 27 letter that formally withdrew these documents, however, the Department indicated that it would issue a new "Notice" based on a finding following an "investigative public hearing." Although the hearing was held on December 19, 1988, the Commissioner has not issued a new Notice to date.

At this point, therefore, CSI checks formally remain exempt from the restrictions the statute places on out-of-state instruments under the Department's April 6 approval. Depending upon the Commissioner's findings yet to be issued, however, this exemption may soon be terminated. In its current motion, CSI asserts that the entire statute—including the four-part test under which it has received exemption—violates the Commerce Clause.

## III. DISCUSSION

### A. *Defendant's Motion to Dismiss*

Defendant moves under FED.R.CIV.P. 12(b)(6) to dismiss the complaint for failure to state a claim or, in the alternative, under Rule 56 for summary judgment. Although defendant's papers are far from clear, it appears that she contends that plaintiff in

its original complaint attacked only the validity of the July 26 "Notice" and the August 3 letter both of which have been rescinded. If this were the case, defendant could argue, then plaintiff would be precluded from challenging the constitutionality of the underlying statute in this proceeding.

Such a challenge is groundless. As defendant should be aware, plaintiff filed their First Amended Complaint on October 17, 1988. Thus, defendant cannot argue over the contents of plaintiff's original complaint. Moreover, the amended complaint includes in its Third Cause of Action a claim for injunctive and declaratory relief based on the constitutional invalidity of the statute. We further note that the original complaint's Third Cause of Action also claimed that the statute violated the Commerce Clause for the one of the reasons at issue in the instant hearing: that the exemption provision applied only to out-of-state financial institutions.

Defendant also moves to dismiss on the grounds that the matter is moot since the Department has rescinded the July 26 Notice and August 3 letter and thus treats CSI like in-state financial institutions. This issue shall be discussed below in the context of whether CSI has demonstrated the threat of irreparable harm.

### B. *Plaintiff's Motion for Preliminary Injunction*

■ To obtain a preliminary injunction, a party must demonstrate either (1) a combination of probable success on the merits *and* the possibility of irreparable injury if relief is not granted, or (2) the existence of serious questions going to the merits and that the balance of hardships tips sharply in its favor. *First Brands Corp. v. Fred Meyer, Inc.,* 809 F.2d 1378, 1381 (9th Cir. 1987). The Ninth Circuit has made clear that these "are not two distinct tests, but rather the opposite ends of a single continuum in which the required showing of harm varies inversely with the required showing of meritoriousness." *Rodeo Collection, Ltd. v. West Seventh,* 812 F.2d 1215, 1217 (9th Cir.1987). Thus, we review the balance of hardships and the probability of success on the merits.

### 1. *Balance of Hardships*

The defendant argues that plaintiff cannot establish a threat of irreparable harm since CSI is currently unaffected by the restrictions imposed upon out-of-state checks under the statute. She maintains that a preliminary injunction is not warranted until the Commissioner interprets the statute in a manner adverse to CSI. In practical terms, the defendant asserts that plaintiff must wait until the Commissioner issues a decision based on the December 19 hearing and can only proceed if she rules that California institutions "generally" collect items in one day. At the outset, we note that the Department does not claim that it will suffer any harm if we grant the preliminary injunction.

We disagree with defendant's assertion for numerous reasons. First, we question defendant's apparent position that plaintiff must wait until it suffers actual damage, especially when plaintiff asserts violation of constitutional rights. At least at this point, plaintiff asserts that regardless of the Commissioner's determination the statute violates its rights under the Commerce Clause. Wholly apart from whether it qualifies for exemption, CSI contends that the exemption process imposes an impermissible burden on interstate commerce by requiring out-of-state institutions to apply for approval not required of in-state banks. In various cases, courts in the Ninth Circuit have presumed irreparable harm from an alleged violation of constitutional rights. *Jacobsen v. U.S. Postal Service,* 812 F.2d 1151, 1154 (9th Cir.1987) (First Amendment); *McGinnis v. U.S. Postal Service,* 512 F.Supp. 517, 525 (N.D.Cal.1980). *See also,* 11 C. Wright and A. Miller, *Federal Practice and Procedure, Civil,* § 2948 at 440 ("where an alleged deprivation of a constitutional right is involved, most courts hold that nor further showing of irreparable injury is necessary"). Although in this case plaintiff is responsible for one provision of the statute it now challenges, these cases suggest that the alleged constitution-

754

al violation alone should give rise to a presumption of irreparable harm.

In this instance, plaintiff has further established that such a presumption is warranted. As even defendant acknowledges, plaintiff could "be barred from issuing financial instruments for escrow transactions in California" by the Commissioner's decision currently under consideration. Defendant's Answer, ¶ 9. Plaintiff would suffer not only the loss of business but the accompanying goodwill and reputation. Other circuits have held that injury to goodwill and reputation constitute irreparable harm that justify injunctive relief. *Planned Parenthood v. Citizens for Com. Action*, 558 F.2d 861, 867 (8th Cir.1977). More importantly, plaintiff has already suffered due to the statute. From 1985 until April 6, 1988, the statute effectively precluded SCI from the California escrow fund transfer services market. Since April 6, 1988, the defendant Commissioner through the July 26 Notice and August 3 letter has attempted to apply the amended statute towards the same effect.

We thus conclude that the balance of hardships tips in favor of plaintiff. Defendant has not claimed, let alone demonstrated, any threat of harm or injury. In contrast, defendant has previously taken steps under the authority of the statute that effectively would have precluded CSI from participating in California escrow transactions.

2. *Probability of Success on the Merits*

■ In analyzing the validity of state regulation under the Commerce Clause, the Supreme Court has adopted a two-tiered approach. As stated recently in *Brown–Forman Distillers Corp. v. New York State Liquor Authority*, 476 U.S. 573, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986):

When a statute discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, we have generally struck down the statute without further inquiry. *See e.g., Philadelphia v. New Jersey*, 437 U.S. 617, 57 L.Ed.2d 475, 98 S.Ct. 2531 (1978).... When, however, a statute has only indirect effects on interstate commerce and regulates evenhandedly, we have examined whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits. *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 25 L.Ed.2d 174, 90 S.Ct. 844 (1970). We have also clearly recognized there is no clear line separating the category of state regulation that is virtually per se invalid under the Commerce Clause, and the category subject to the *Pike v. Bruce Church* approach. In either situation the critical consideration is the overall effect of the statute on both local and interstate activity.

476 U.S. at 579, 106 S.Ct. at 2084. Even though this statute appears unarguably to discriminate against out-of-state interests on its face, we shall also analyze the purported local interests to indicate that the statute would also be impermissible even if we utilized the balancing approach.[5]

a. Facial Discrimination

As stated in the above quotation, a statute that discriminates on its face "is virtually per se invalid" and is "generally struck down without further inquiry." This direction seems applicable to the instant case.

By the explicit terms of the statute, out-of-state checks (and by necessity out-of-state financial institutions) are not treated as favorably as in-state checks (and the

5. We wish to emphasize that the defendant does not claim that Congress has delegated its commerce power over escrow accounts to the states. Thus, the Department does not argue that it possesses any authority to regulate interstate commerce in this field other than that traditionally left to the states in the absence of Congressional action. In this respect, their position is in keeping with Ninth Circuit authority that has held that the McCarran Act, 15 U.S.C. § 1012(a), that delegates the "business of insurance" to the states does not authorize state regulation of escrow services even if performed by insurance companies. *United States v. Title Insurance Rating Bureau of Arizona*, 700 F.2d 1247 (9th Cir.1983). *See also, Group Life & Health Insurance Co. v. Royal Drug Co.*, 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979).

institutions on which they are drawn). Checks drawn on out-of-state institutions must clear before their proceeds can be disbursed by escrow accounts but escrow accounts need not wait to disburse the proceeds from checks drawn on in-state banks. If an out-of-state institution wishes to obtain the same preferential treatment granted in-state banks, it must obtain the approval of the Department of Insurance by satisfying four conditions. In-state institutions need neither obtain such approval nor satisfy such requirements.

In *Philadelphia v. New Jersey,* 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978), the Supreme Court applied this "virtually per se rule of invalidity" to a statute that similarly discriminated against out-of-state economic interests on its face. In that case, a New Jersey statute provided that no liquid or solid waste "originated or collected outside the territorial limits of this state until the commissioner of [the state's Department of Environmental Protection] shall determine that such action can be permitted." 437 U.S. at 618, 98 S.Ct. at 2532. Expressly rejecting the approach of the lower courts that had considered the validity of the legislative purpose, the Supreme Court stated

> whatever New Jersey's ultimate purpose, it may not be accomplished by discriminating against articles of commerce coming from outside the State, unless there is some reason, apart from their origin, to treat them differently.... The Court has consistently found parochial legislation of this kind to be constitutionally invalid, whether the ultimate aim was to assure a steady supply of milk by erecting barriers to allegedly ruinous outside competition, or to create jobs by keeping industry within the State, or to preserve the State's financial resources by fencing out indigent immigrants. In each of these cases, a presumably legitimate goal was sought to be achieved by the illegitimate means of isolating the State from the national economy.

437 U.S. at 627–28, 98 S.Ct. at 2537–38. Although the statute in this case excludes out-of-state institutions from the California escrow market as a practical rather than as

a legal matter, *Philadelphia* reaffirms that such facially preferential treatment of in-state economic interests violates the Commerce Clause. *See also, Lewis v. BT Investment Managers, Inc.* 447 U.S. 27, 36, 100 S.Ct. 2009, 2015, 64 L.Ed.2d 702 (1980) (holding Florida statute that precluded out-of-state banks from offering investment advisory services violates Commerce Clause).

The defendant asserts that the statute does not discriminate against out-of-state institutions but simply holds them to "precisely the same standards 'as generally occurs for items drawn on California institutions'." Defendant's Opposition at 12. This claim cannot be supported. First, only out-of-state institutions must satisfy the four criteria outlined by the statute and obtain the approval of the Commissioner. As CSI's experience indicates, the requirement that out-of-state institutions obtain exemption may be a significant obstacle even if the institution does satisfy the requirements. More importantly, defendant's assertion is untrue. Although out-of-state institutions are held to the standards specified in the four-part test, in-state institutions are not. As plaintiff states, "No California bank, no matter how small or remotely located, must show that its items are collected within the same time frame as generally occurs for California institutions, much less demonstrate compliance with the remaining three criteria of Section 12413(c)." Plaintiff's Reply Memorandum at 11.

### b. Legitimacy of Local Interests

Even if we were to examine whether the State's interest is legitimate and whether the burden on interstate commerce exceeds the local benefits under the *Pike v. Bruce* balancing test, we would reach the same conclusion. Although this standard is not warranted since the statute discriminates against interstate commerce on its face, defendant cannot demonstrate that the statute advances the local interests claimed on its behalf.

In its memorandum, the defendant maintains that the statute was enacted to elimi-

nate the "risk of dishonor" and the "delay risk." These arise when title companies disburse the proceeds from escrow accounts before checks deposited into those accounts have cleared. The risk of dishonor concerns the risk that checks relied upon by escrow agents will not be honored by banks and thus will leave those agents with insufficient funds if the proceeds have already been distributed. The risk of delay arises if the bank on which the check is drawn benefits at the expense of the escrow agent by holding the funds to collect interest rather than releasing them to the escrow immediately.

Contrary to defendant's assertions, however, the statute does not reduce or eliminate either risk since it does not regulate in any manner in-state institutions which comprise ninety-five percent of all checks deposited into California escrows. With regard to the risk of dishonor, the statute does not reduce, let alone eliminate, the current risk for in-state checks since it allows escrow agents to disburse proceeds from those checks upon receipt. Defendant's argument concerning the risk of delay is similarly unconvincing, particularly since CSI's zero-balance checking procedure means that CSI does not have the funds on deposit at the time the check is issued. In light of the disparate treatment afforded in-state and out-of-state institutions, we can only conclude that the statute cannot pass muster even under the more lenient balancing test.

### C. *Summary*

Plaintiff has clearly demonstrated the existence of serious questions going to the merits and that the balance of hardships tips in its favor. To be sure, plaintiff is not suffering immediate harm and possibly will not at all if the Commissioner accepts CSI's argument that "generally" the collection period for California banks is two days. However, the statute on its face discriminates against interstate commerce. Even if we were not to presume irreparable harm from a constitutional violation, the terms of the statute certainly suggest extremely serious questions going to the merits. Plaintiff has thus satisfied the burden

required of a moving party seeking a preliminary injunction.

## IV. CONCLUSION

Plaintiff's motion for a preliminary injunction is granted and defendant's motion to dismiss or, in the alternative, for summary judgment, is denied. Thus, as requested by plaintiff in their motion, we hereby enjoin defendant from enforcing California Insurance Code Section 12413.

IT IS SO ORDERED.